Filed 8/17/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.P. et al., Persons Coming Under the Juvenile Court Law. | B277756 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.S.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK17337) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Akemi D. Arakaki, Judge.  Reversed and remanded.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel and Aileen Wong, Deputy County Counsel for Plaintiff and Respondent.

———————————————

When a dependency court declares children dependent and removes them from a parent's custody, is it within the court's discretion to order a reunification plan with which the parent indisputably cannot comply due to a language barrier?  We find the answer rather self-evident and conclude that such a plan, doomed to fail, is an abuse of discretion.  We therefore reverse the dispositional order that imposed it.

## FACTUAL AND PROCEDURAL BACKGROUND

1.    *Family History*

In 2013, father A.S. (father) immigrated to the United States, from Myanmar, with two of his four children.  His wife, A.Z. (mother), and their other two children, remained in a refugee camp in Thailand, awaiting permission to immigrate and rejoin the family.  Father speaks only Burmese or Karen.[1]

When father came to the United States with two of his daughters, the divided family lived with paternal great uncle (uncle) and several other relatives.  Uncle tried to help father get on his feet, but was stymied by father's drinking and lack of interest.  Uncle signed up father for English as a Second Language (ESL) classes, but father refused to attend.  Uncle obtained a job for father, which father lost because he showed up drunk or not at all.  Uncle bought father a used car, but father refused to pay for the car registration or insurance.  After a year, uncle stopped trying to get father to work, and simply wanted him to focus on taking care of his children.  This, too, failed, as father preferred to drink all night, rather than take care of his

---

[1]    Father and his family were from a Karen village; the Karen people were oppressed by the Myanmar military government.  Father fled Burma for a refugee camp in Thailand in 1996.  He and mother were married in the camp.

daughters. Uncle was an assistant pastor at his church, and many in the church community also tried to assist father, even going so far as helping to clean the room father shared with the girls. But father would not stop drinking and become a responsible parent. Uncle and other family members took up the cause, and cared for the two girls.

2. *Department of Children and Family Services (DCFS) Involvement*

Father's circumstance finally came to the attention of DCFS on April 18, 2016, with an anonymous call to a child abuse hotline. The reporter claimed that father got drunk every day and left uncle and other relatives to care for the children. Upon DCFS's investigation, it was clear that father did, in fact, have a serious drinking problem. The bedroom father shared with the two girls, then aged 9 and 5, had empty beer cans on the floor and smelled of urine. Both children reported that father drank beer regularly and smelled of beer and smoke. Uncle stated that all father did was drink. Uncle did not mind caring for the children, but wanted father to step up and do so. Uncle agreed that father was very good with the girls when he was not drinking, but essentially father drank all the time.

Father himself admitted drinking three to five cans of beer a day, but did not think this was a problem. When asked if he would give up custody of the children to uncle, father said that he would not, and instead said he would stop drinking.

Father stopped drinking for one or two days, but then returned to his old practice. Uncle agreed to take custody of the children.

3

3.    *The Children are Detained*

On May 5, 2016, father met with the DCFS social worker. He admitted that he was still drinking and said he wanted to stop. Father stated that he understood he needed more help. He consented to placing the children in uncle's care and "agreed to either residential or outpatient drug/alcohol program." When told he would have to leave uncle's home, he agreed to stay at a family friend's residence. DCFS detained the children in uncle's care.

A petition was filed on May 10, 2016, alleging that both children were dependent under Welfare and Institutions Code section 300, subdivision (b), on the basis that father's alcohol use rendered him incapable of providing them with regular care and supervision.[2]

At the detention hearing, on May 10, 2016, the court ordered reunification services. The court directed DCFS to provide father with referrals for an alcohol treatment program and for weekly random and on-demand alcohol testing. Father was granted monitored visitation.

4.    *DCFS Provides Minimal Services Due to Father's Language Barrier*

On June 20, 2016, DCFS completed its report for the upcoming jurisdiction/disposition hearing. The report contained further evidence of father's drinking history, including uncle's statement that father had been abusing alcohol since he was a teenager. It also included an allegation by another relative that father's drinking in the refugee camp led to an act of domestic

---

[2]    All undesignated statutory references are to the Welfare and Institutions Code.

4

violence in which father kicked then-pregnant mother so hard she nearly died and the baby was born early.

Father admitted drinking, but attempted to minimize its extent. Nonetheless, father stated he was willing to participate in a treatment program.

The department's report conceded that "there is a problem in securing alcohol-related services for [father] because he only speaks Burmese." It went on to state that the "largest challenge in this case will be to find treatment for father that he can understand. It appears that a residential program would be the most helpful for father considering his reportedly ongoing alcohol use since a teenager. But once again, the effectiveness of his treatment would be based on his understanding of the treatment program's concepts – and at this point a program could not be found with a Burmese translator." The department suggested the possibility that father could attend 12-step meetings with a friend or relative who could translate for him.

DCFS recommendations included that father be ordered to complete a parenting class "if one exists in Burmese or with appropriate translation" and that father be ordered "to participate in an alcohol treatment program that would be appropriate to his needs, taking into account that he speaks only Burmese." DCFS also recommended that father participate in random drug testing.

A July 15, 2016 last minute information for the court noted that father had been unable to drug test randomly. The system required father to call in regularly and test when his "letter was called," but, despite trying to "listen for his letter," father's limited English prevented him from understanding when the

5

letter was called. DCFS was working on a way to enable father to test using Google Translate.

The adjudication hearing, then set for July 15, 2016, was continued for another month. DCFS was directed "to assist the father with his weekly random and on demand drug and alcohol testing." The department was also ordered to prepare a supplemental report for the next hearing addressing "any services" that were put in place for father.

The August 12, 2016 last minute information from DCFS indicated that the social worker is "very good at using his [social worker's] cellphone to translate English to Burmese." Father did not have a cellphone, but the social worker had recently reminded father to call the random drug testing number by communicating with a friend of father's. Father had tested negative on one date, but had three " 'No Shows,' " which DCFS attributed to failures to communicate.[3] Other than this limited success with drug testing, DCFS reported that it had been "unable to locate any treatment options for father that are given in the Burmese language."

The adjudication hearing was continued for another month in an effort to provide notice to mother, who was still living in the refugee camp. Father's counsel represented to the court that father had difficulties understanding when he was to randomly test. He requested that father's alcohol testing be changed from random – which required phoning in and listening for direction – to on-demand – which was at the social worker's direction. The trial court agreed, and made that its order.

---

[3] A later diluted test appears to have undermined DCFS's attribution. (See fn. 4., post.)

6

The September 9, 2016 last minute information from DCFS indicated that the social worker for a time had been unable to contact father as father had been "unable to notify" DCFS of his change of phone number "and attempts to use English-Burmese translation software yielded inconsist[ent] results." However, on August 23, 2016, the social worker met with father and a friend of father's who acted as an interpreter. The social worker and father set up a system which would enable father to be notified of on-demand alcohol/drug testing. The system was put into effect, and on August 26, 2016, father tested negative.[4]

5. *The Adjudication/Disposition Hearing*

The adjudication/disposition hearing was ultimately held on September 9, 2016. The petition was amended to allege that father was a "recent user" of alcohol which "sporadically" rendered him incapable of caring for the children. As amended, father pleaded no contest to the petition, and it was found true.

After adjudicating the children dependent, the court proceeded to disposition. The children remained placed with uncle. DCFS had provided a recommended case plan which included a "full drug/alcohol program with aftercare," a "12 step Program w/court card & sponsor," and "Developmentally Appropriate" parenting. Father's counsel objected to the case plan on the basis that father could attend none of the identified programs. Counsel explained, "Language has been an issue in this case. We have asked for referrals when this case started in . . . May. And in July, the update from the Department is that

---

[4] The test report notes father's urine sample was "dilute." DCFS's characterization of the test as "negative" notwithstanding, legally the test was "effectively inconclusive." (See *In re Natalie A.* (2015) 243 Cal.App.4th 178, 186.)

7

they could not find [any] language programs. Due to that fact, I would ask for no programs to be ordered by this court and for only on-demand testing." Father's counsel also requested an order that DCFS provide father with Alcoholics Anonymous (AA) books in Burmese, which were apparently available, and a referral (but not order) for ESL classes.

The court noted father's objection but stated, "I completely appreciate it, and I understand it. And I am completely in agreement with the fact that it is difficult." The court signed the case plan DCFS had sought, and concluded, "I do believe I need to make the orders as to disposition as requested." Father was ordered to participate in a full drug and alcohol program with on-demand testing, a 12-step program, and a parenting program. The court added, "the Department is to assist the father in locating programs in Burmese or with appropriate translation." In addition, the court agreed to father's request that he be provided with AA books in Burmese and with a referral to ESL classes.

6.    *Appeal*

Father filed a timely notice of appeal from the disposition order. On appeal, he argues that the trial court erred by ordering him to complete programs his language barrier prevented him from completing. He seeks an appellate disposition amending the plan "to either find Burmese speaking services, a third[-]party translator to attend with father to translate English-speaking services, or . . . eliminat[ing] all services except on-demand drug testing."

7.    *Subsequent Proceedings*

DCFS would eventually move to dismiss the appeal on the basis that subsequent proceedings rendered it moot. First,

8

mother and the other two children arrived in America on February 23, 2017, and moved in with father. Second, on March 30, 2017, the court placed the children in "Home of Parent(s)" under DCFS supervision. Family maintenance services replaced reunification; and father's case plan was modified to weekly on-demand testing only. We requested DCFS provide this court with the reports which led to this order. We take judicial notice of those reports, in which the only reference to father's compliance with the case plan is a statement that father had been ordered to drug test on-demand, and that he had continued to do so (and test negative). DCFS made no reference to the case plan requirements of alcohol treatment, a 12-step program, and parenting.

Two months later, something went wrong with the family's progress, although the present appellate record does not provide much detail. A June 1, 2017 minute order indicates that a subsequent petition was filed as to the two children already detained, and a new petition was filed as to the two children who had recently immigrated to America. The minute order reflects that the new petitions included allegations under section 300, subdivision (a), pertaining to physical abuse. All four children were detained from father and released to mother, whose contact information was to remain confidential. No precise case plan was indicated for father; the minute order simply stated, "DCFS is to continue to work with the family in determining the best plan on how to move forward." Father received monitored visitation with his children.

We take judicial notice of two further minute orders. In July 2017, the subsequent petition as to the first two children was sustained, as was the petition with respect to the two

children who had recently immigrated. The court found that DCFS had made reasonable efforts to enable reunification, but the progress made (by father, it appears) had been minimal. All four children were placed with mother. The court then terminated jurisdiction with a custody order granting sole legal and physical custody to mother, with father to have monitored visitation only.

## DISCUSSION

1.    *We Deny DCFS's Motion to Dismiss the Appeal*

Preliminarily, we address DCFS's motion to dismiss. DCFS argued that the appeal is moot based on the March 30, 2017 "Home of Parents" order, in that the order both (a) effectively returned the children to father's care; and (b) modified his case plan to only on-demand testing, one of the alternative remedies he seeks on appeal.

" 'An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. [Citations.] On a case-by-case basis, the reviewing court decides whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding. [Citation.]' [Citation.]" (*In re M.C.* (2011) 199 Cal.App.4th 784, 802.) Courts also have discretion to resolve appeals that are technically moot if they present important questions affecting the public interest that are capable of repetition yet evade review. (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1078-1079.)

Regardless of whether we would have found the appeal moot in light of the March 30, 2017 minute order, the June and July orders establish that it is not. As to DCFS's first argument,

10

that the children were returned to father, that is simply no longer true. Father has, in fact, lost legal and physical custody of the children, with only monitored visitation. DCFS's second argument, that father's plan has been modified to on-demand testing, also does not moot this appeal. Father sought alternative remedies on appeal, including a case plan that included services in Burmese or provision of an interpreter. Father's request for those remedies is not moot. Indeed, it is all the more important given that he has lost custody of his children for failing to make sufficient progress toward remedying the problems which had necessitated their initial removal.

2.     *Governing Authority and Standard of Review*

At a disposition hearing, the court shall order reunification services for the parents. (§ 361.5.) The order "may include a direction to participate in a counseling or education program . . . ." (§ 362, subd. (d).) "The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child" was dependent. (*Ibid.*)

Some six months later, the court typically holds a status review hearing. (§ 366.21, subd. (e)(1).) At that hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*) "If the child is not returned to his or her parent or legal guardian, the court shall determine whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial

11

removal and the continued custody of the child have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (e)(8).)

If the parent is appealing the reunification services ordered by the dependency court at the disposition hearing, the Court of Appeal reviews the dependency court's decision for abuse of discretion. (*In re D.C.* (2015) 243 Cal.App.4th 41, 56; *In re A.E.* (2008) 168 Cal.App.4th 1, 4.) If the parent is appealing the court's factual finding rendered at a status review hearing that reasonable services have been provided or offered to the parent, the Court of Appeal reviews the dependency court's finding for substantial evidence. (*In re T.G.* (2010) 188 Cal.App.4th 687, 697; *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346.) This distinction makes logical sense. The dependency court's order at the disposition hearing is forward-looking; the court is making a determination as to what services it believes will assist in eliminating the conditions that led to dependency. This calls out for abuse of discretion review. But the court's finding at a review hearing that reasonable services have in fact been provided is backward-looking; the dependency court is considering evidence of past events and determining, with the benefit of hindsight, whether the services supplied were reasonable. This dictates substantial evidence review.

3. *The Trial Court Abused Its Discretion in Failing to Order Effective Reunification Services*

The question presented, then, is whether the court abused its broad discretion in making its disposition order, by requiring father to participate in a drug and alcohol program, a 12-step program, and a parenting program – even with the direction that

DCFS was to "assist the father in locating programs in Burmese or with appropriate translation."[5]

The court's discretion in fashioning reunification orders is not unfettered. Its orders must be reasonable and designed to eliminate the conditions that led to the court's finding of dependency. (*In re D.C., supra,* 243 Cal.App.4th at p. 56.) The reunification plan must be appropriate for each individual family and based on the unique facts relating to that family. (*In re Daniel B.* (2014) 231 Cal.App.4th 663, 673.) "The effort must be made to provide suitable services, in spite of the difficulties of doing so . . . ." (*In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777.)

On appeal, DCFS argues that the reunification plan was within the court's discretion in that it was justified by father's serious alcohol problem, dating back to his teenage years. We do not disagree, as far as that goes. Father's drinking history certainly supports the order for an alcohol program and a 12-step program. His inability to care for his daughters justified an order to attend parenting. If father could actually engage in those programs, ordering father to participate in them would, in fact, be reasonably designed to eliminate the conditions that led to the finding of dependency, and we would affirm the order without delay.

However, DCFS's argument fails to consider the critical fact in this case: father could not participate in the programs, due to his language barrier. The history of the case leading up to the disposition order establishes this beyond any doubt. When

---

[5] Although the legal analysis would be different if we were considering whether substantial evidence supported the reasonableness of the reunification services actually provided, our ultimate conclusion – that it did not – would be the same.

13

the children were detained in May 2016 – months before the disposition order – father agreed to attend either a residential or outpatient alcohol program.  At the detention hearing, the court ordered the department to "provide the father with referrals for alcohol treatment program."  The disposition hearing was held four months later, in September.  In the interim, the court did not change its order that father be referred to an alcohol treatment program, but father was never referred to a specific one.  In July, the court ordered DCFS to prepare a supplemental report "addressing any services that [have] been put in place" for father.  DCFS's supplemental report responded that, other than alcohol testing, the department has "been unable to locate any treatment options for father that are given in the Burmese language."  Indeed, it was not until late August that DCFS and father came up with a solution to enable father even to regularly perform alcohol tests – by changing from random testing to on-demand testing.

In light of these facts, the court's order is not saved by its addendum that DCFS was to "assist the father in locating programs in Burmese or with appropriate translation."  At the time of the order both DCFS and the dependency court were told there were no programs in Burmese.  The department had already tried to find them and reported to the court that there were none.  As to the reference to "appropriate translation," this clause is too uncertain to provide the necessary guidance.  It falls short of what the record shows was the only meaningful way that father could *participate in* the programs everyone agreed were

necessary – an order that DCFS provide an interpreter or other suitable means for father to access treatment.[6]

In short, the dependency court, after being advised by DCFS that the department could provide no realistic treatment program for father because of his language barrier, nonetheless ordered father to participate in a case plan that included an ineffective alcohol treatment program. It is too early in these proceedings for us to consider whether it would violate constitutional principles to terminate a father's parental rights based on his inability to participate in court-ordered programs in a language he does not understand. (*Santosky v. Kramer* (1982) 455 U.S. 745, 753 [state intervention to terminate the parent/child relationship must be accomplished by procedures satisfying the Due Process Clause].) No party raises the constitutional issue, and the case has not reached the point of termination. Still, we cannot ignore the fact that at some point

---

[6] The department suggests that, as the court's language placed the burden on DCFS to assist with locating programs in Burmese, father could simply "challenge whether DCFS provided reasonable reunification services at the time of the review hearings." That may be true but it misses the mark. Reunification services are limited in time; a maximum two-year clock starts running when the children are detained. (§ 361.5, subd. (a)(4)(A).) Father should not be required to waste six months of precious reunification time waiting to challenge the department's provision of inadequate services when it was apparent from the disposition hearing that the services ordered were inadequate. We cannot endorse a reunification plan that is sure to fail, even though the plan may appear reasonable in the abstract.

the failure to provide services in Burmese or Karen may rise to a constitutional level.

The due process considerations also inform our conclusion that it is an abuse of discretion to make a dispositional order with the knowledge that a parent cannot participate in the ordered services. No parent should be placed in this trap. The remedy is for DCFS and the court to provide language assistance of some sort. Our dependency laws require reasonable reunification services for parents (§ 361.5) but those services are fundamentally for the protection of the children. A dependent child is at risk if a parent with an untreated serious alcohol problem is given custody of, or visitation with, such child, without a program to address the problem. That DCFS could not easily arrange for services in a language a parent could understand is of no consolation to a child who has been abused or neglected.

We find significant that the Strategic Plan for Language Access in the California Courts, prepared by the Joint Working Group for California's Language Access Plan, and adopted by our Judicial Council on January 22, 2015, supports our concerns. Recommendation 11 of the plan states, "An LEP [limited English proficient] individual should not be ordered to participate in a court-ordered program if that program does not provide appropriate language accessible services. If a judicial officer does not order participation in services due to the program's lack of language capacity, the court should order the litigant to participate in an appropriate alternative program that provides language access services for the LEP court user. In making its findings and order, the court should inquire if the program provides language access services to ensure the LEP court user's ability to meet the requirements of the court." (Language Access

16

Plan, pp. 39-40.) Implementation of this regulation "should begin by [2016-2017]." (*Id*. at p. 93.) There is no indication in the record that the dependency court was in keeping with the spirit this recommendation. Had it done so, it would not have ordered father to complete an alcohol program that father could not understand.

We acknowledge that father's ability to speak only Burmese or Karen presents a problem for the court in crafting an appropriate disposition order. The dependency court was aware of the dilemma it faced. Its efforts were well-intended and a good start. Perhaps due to the court's perception that its options were unduly limited, the court felt constrained in its disposition. The court recognized that father needed alcohol treatment, and correctly rejected father's request that he be ordered only to comply with alcohol testing. However, the known circumstance of father's language barrier was such that father could comply with nothing the court ordered *except* testing – resulting in the foreseeable result that father received no treatment for his very serious alcohol problem. Not surprisingly, father's failure to get alcohol treatment may very well have contributed to the subsequent dependency petition raising claims of physical abuse.

The language problem is not insoluble. It calls for creativity on the part of DCFS in presenting a plan to the court, and not simply parroting the standard case plan for an English- or Spanish-speaking parent with an alcohol problem. Several jurisdictions have successfully addressed the situation, either through the use of interpreters or service providers with language skills. For example, in *In re Sorin P.* (N.Y. App. Div. 2009) 873 N.Y.S.2d 89, the parents challenged the termination of their parental rights. On appeal, the court had to consider

17

whether the petitioner had "made diligent efforts to encourage and strengthen the parental relationship." (*Id.* at p. 90.) This included accommodating the parent's "special needs, including use of a language other than English." (*Id.* at pp. 90-91.) Here, the standard was met, as the petitioner had provided an "interpreter for the Romanian-speaking parents." (*Id.* at p. 91.)

Other courts have followed suit. (E.g., *Pravat P. v. Dep't of Health & Soc. Servs.* (Alaska 2011) 249 P.3d 264, 268-271 [sufficient active efforts were made toward reunification when the agency paid for an interpreter for case planning, legal meetings, and classes to help father manage his emotions and learn parenting]; *State of N.M. ex rel. CYFD v. William M.* (N.M. Ct. App. 2007) 161 P.3d 262, 271, 278 [reasonable efforts to reunify included the use of a Spanish-speaking social worker and visiting father at his place of incarceration with an interpreter to obtain a psychosocial evaluation; father was not entitled to translations of documents into his language]; *In re Abraham C.* (N.Y. App. Div. 2008) 865 N.Y.S.2d 820, 822 [diligent efforts included arranging for a Spanish-speaking therapist to counsel the parents]; *In re Lopez* (Ohio Ct. App. 2006) 852 N.E.2d 1266, 703 [reasonable efforts included providing father with the interpreter's phone number so that he could contact her at any time to interpret for him].)

A number of courts have found sufficient services have not been provided, when the language barrier was not satisfactorily addressed. (E.g., *In re Alicia Z.* (Ill. App. Ct. 2002) 784 N.E.2d 240, 253 [DCFS administrator admitted that DCFS failed to provide father with adequate services in Spanish]; *In the Interest of J.L.* (Iowa Ct. App. 2015) 868 N.W.2d 462, 465, 467 [department violated statutory obligation to make reasonable

efforts to facilitate reunification by not providing deaf mother a sign language interpreter]; *In re Richard W.* (N.Y. App. Div. 1999) 696 N.Y.S.2d 298, 300 [diligent efforts were not made due to failure to address mother's language difficulty; it was recommended that she be provided a Polish-speaking therapist, but the recommendation was ignored until the court ordered it and "no such therapy was ever provided"]; *In re P.S.S.C.* (Pa. Super. Ct. 2011) 32 A.3d 1281, 1286 [reversing termination of parental rights when services provided incarcerated father were "completely inadequate for an unrepresented Spanish-speaking individual without access to an interpreter"].)

 While a few cases have rejected claims that interpreters should have been provided, they were based on unique factual scenarios in which it appears that other individuals were present and available to translate. (See *In Interest of S.J.* (Fla. Dist. Ct. App. 1994) 639 So.2d 183, 184 [father cannot complain of a lack of interpreter for meetings with department officials when he had a friend along to interpret for him and never raised the issue prior to the termination hearing]; *In re Kafia M.* (Me. 1999) 742 A.2d 919, 926-927 [balancing all factors, it was not a due process violation to provide mother with an interpreter only at the termination hearing, when, among other factors, father could have interpreted for her before they started living apart].)

 We accept that it is unlikely father can participate in an English-language residential treatment program alone, but the record does not indicate that a concerted effort was made to address father's drinking problem in a program of individual counseling, either with a Burmese-speaking counselor or the assistance of an interpreter at treatment sessions. While DCFS considered the possibility of father attending AA meetings with a

19

family member or church acquaintance, it does not appear that anyone contacted local AA groups to see if they had any Burmese-speaking members who would be willing to act as father's sponsor. We do not mean this to be an exhaustive list of possibilities. Nonetheless, the record is silent as to the extent of DCFS's efforts to obtain services in Burmese, whether a Burmese or Karen interpreter was available, or if resources were available to pay for such an interpreter. In this regard, we observe that Recommendation 10 of the Language Access Plan states, "Beginning immediately, as resources are available, but in any event no later than 2020, courts will provide qualified interpreters in all court-ordered, court-operated programs, services and events, to all LEP litigants, witnesses, and persons with a significant interest in the case."[7] (Language Access Plan, p. 39.)

---

[7] We recognize that this Recommendation of the Language Access Plan applies only to programs which are both "court-ordered" *and* "court-operated" and the services which father needed were court-ordered, but not court-operated. The Language Access Plan is a baseline – a first step toward resolving the problems faced by numerous LEP individuals when they interact with the court system. One "next" step would be for DCFS, in those situations in which it formally contracts with a provider, to include as a contractual term that programs provide proper services in the parent's language; in those situations not governed by a formal contract, DCFS should refer parents only to programs that have appropriate language assistance. In the meantime, DCFS may not bury its head in the sand and recommend that the court order a parent to participate in services which DCFS knows cannot be provided.

Three things, however, are apparent: (1) father needed alcohol treatment, not just on-demand testing; (2) Burmese interpreters exist – in fact, one assisted father at every court hearing; and (3) father has had some level of success communicating with DCFS through the use of internet-based translation software and friends acting as interpreters. Given these facts, the record reflects a failure to craft a reunification plan that provided father with necessary alcohol treatment in a language he can understand. Therefore, the order that he attend a drug treatment program, a 12-step program, and parenting, without any further detail as to how such programs could be attended, given his known language difficulties, constituted an abuse of discretion.

That is the sole issue before us, and we therefore do not address the propriety of any of the trial court's subsequent orders. It seems apparent, however, with the benefit of hindsight, that the March 30, 2017 order, which concluded sufficient progress had been made toward treating father's alcohol problem based only on his participation in on-demand testing was, at best, overly optimistic. The limited record before us suggests that all parties were eager to assume on-demand testing had resolved father's alcoholism, even though the court had, at the disposition hearing, previously concluded that actual treatment was necessary. To what extent the parties' blindness to father's need for treatment played a part in his ultimate loss of custody and the termination of jurisdiction, we cannot say.

4. *Remedy*

While we conclude the court erred in its disposition order, we do not accede to father's request that we amend the reunification plan to include specific requirements. Thus, we do

not direct the dependency court to order provision of a Burmese interpreter at this time, but we do not foreclose it either.  The June and July 2017 minute orders reflect that the facts have changed; new allegations against father have been sustained and jurisdiction terminated, leaving father with only monitored visitation with his children.  Because we lack specific information as to the intervening factual and procedural developments, and do not know of their possible effect on father's situation, we leave it to the sound discretion of the dependency court to determine what procedural steps are appropriate at this juncture in light of our reversal, the grounds on which it is based, and the current state of affairs.  (See *In re T.W.-1* (2017) 9 Cal.App.5th 339, 349, fn. 10.)  We do not direct that the trial court necessarily unravel its subsequent termination of jurisdiction, but simply leave it to the trial court to determine the appropriate remedy given its erroneous disposition order.  But the trial court must at least reconsider its termination order in light of the views we have expressed.

## DISPOSITION

The portion of the disposition order requiring father to participate in a full alcohol treatment program with aftercare, a 12-step program with court card and sponsor, and parenting is reversed.  The matter is remanded to the dependency court to reconsider its order terminating jurisdiction and for further proceedings consistent with this opinion.

RUBIN, ACTING P. J.

WE CONCUR:


FLIER, J.                         GRIMES, J.

22