Filed 10/30/20  In re J.E. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.E. et al., Persons Coming Under the Juvenile Court Law. | B304393 (Los Angeles County Super. Ct. No. 19CCJP00050) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>E.E.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Jean M. Nelson, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

The father in this juvenile dependency appeal, E.E. (father), is hard of hearing and uses American Sign Language (ASL) to communicate. He challenges the juvenile court's finding made at the six-month review hearing that the Los Angeles County Department of Children and Family Services (Department) offered him reasonable reunification services. In particular, father argues the juvenile court's finding is not supported by substantial evidence because the drug treatment program to which he was referred struggled to provide, and at times was unable to provide, ASL interpreters for him. As discussed below, we disagree with father and conclude substantial evidence supports the juvenile court's finding. Accordingly, we affirm.

## BACKGROUND

### 1. The Family

Father and G.V. (mother) have six children together, ranging in age from (at the time the underlying dependency petition was filed) 13 years old to one year old. Mother and father are both hard of hearing and use ASL to communicate, although father also communicates by using "signs and talk at the same time." Over the years, mother and father have had a volatile relationship.

## 2. Previous Dependency Referrals and Proceedings

Prior to the instant proceedings, the family had been referred to the Department many times.[1]  In 2005, soon after mother and father's first child was born, the Department received a referral alleging domestic violence by father against mother in the baby's presence.  Following that referral, a voluntary family maintenance case was opened, and the family received voluntary services for almost two years.  In 2007, not long after the voluntary family maintenance case was closed, another domestic violence referral was made but was deemed "Unfounded."

In 2011, law enforcement was called to the family home and a referral was made alleging father verbally abused the oldest child, who was six years old at the time.  That referral was deemed "Unfounded."

The following year, in April 2012, the Department received a referral alleging the second oldest child, who was then three years old and developmentally delayed, had bruising on his buttocks.  During the investigation into that referral, mother reported ongoing domestic violence with father, and father was arrested for domestic violence.  Mother and the children moved away from father, but later returned to live with him.  Eventually, the Department filed a Welfare and Institutions Code section 300[2] petition on behalf of the children alleging the

---

[1] The Department also had received referrals as to mother and her family when mother was a minor, including one in 2005 alleging mother was 17 years old and pregnant with her first child, and father had physically abused mother.  That referral was "Evaluated Out."

[2] Undesignated statutory references are to the Welfare and Institutions Code.

children were at risk because of father's domestic violence against mother, mother's inability to protect the children, and father's abuse of marijuana. The juvenile court sustained the petition and the children were removed from father and placed with mother. The court ordered services for both mother and father. Father reunified and the case was closed in December 2013.

In 2015, father was arrested for domestic violence. The resulting referral to the Department was deemed "Unfounded." Again in 2017, the Department received a referral alleging father physically abused mother as well as their oldest child, who was 11 years old at the time. That referral was deemed "Inconclusive" or "Unfounded."

### 3. Events Preceding the Instant Petition

In early 2018, a referral was made after one of the children, who was eight years old at the time, reported mother and father cursed at her, locked the doors to the house, and made her sleep outside or in the car. During its investigation of the referral, the Department learned of other allegations, including father's ongoing domestic violence against both mother and their oldest child and both parents' inappropriate physical discipline of the children. The Department determined allegations of general neglect, physical abuse, and emotional abuse were substantiated.

In February 2018, a voluntary family maintenance case was opened. Mother and father agreed to participate in services. Father agreed to move out of the family home and to enroll in a domestic violence program, an anger management program, and parenting classes provided through the Center on Deafness Inland Empire (CODIE) located in Riverside. By late May 2018, however, father was homeless and he moved back into the family

home against mother's wishes.  In June, mother asked him to leave but he refused.  In addition, at some point, father harassed mother at her place of work to such an extent that mother lost her job.  Also in June, the juvenile court denied the Department's request to remove the children from father.

The parents' abusive relationship continued.  By the end of 2018, the Department had learned father continued to be abusive toward both mother and their oldest child, who said she punched father in the face because of his verbal abuse.  The oldest child, who was then 13 years old, told a social worker she was tired of helping care for her younger siblings and having her parents discuss their issues with her.  She wanted father to leave the home.  In addition, the second oldest child, who was then almost 10 years old, had expressed suicidal ideation to a service provider and cried unconsolably because of the intense strife in the home.  Mother had made a plan for her and the children to leave father, but she never did.  Instead, she and father told a Department social worker "they would do better."  Father said "he would change his way of treating mother," and mother stated father was "a good man to her."  The children's therapist reported father had not improved and continued to be abusive toward mother and the children.  The therapist believed the family would regress into physical violence if mother and father stayed together.

In mid-December 2018, the parents brought their two-year-old son B.E. to an emergency room because he had ingested marijuana and had an "altered state of mind."  This generated another referral to the Department.  A Department social worker spoke with the parents, who told conflicting and changing stories as to how the child ingested marijuana.  Mother stated neither

she nor father used marijuana, but later both parents reported father and a paternal uncle regularly consumed marijuana.

Despite having available services for most of 2018, mother and father had made little progress. People familiar with the case reported father was "very resistant to changing his behavior and mother remains in denial." Father continued verbally and emotionally to abuse mother and the children and the risk of physical violence remained. At one point, father had stated he would rather the children be in foster care than with mother. In the Department's assessment, although mother and father had completed services to address domestic violence, they failed to use any skills learned. Father took no responsibility for his behavior and instead blamed mother, who in turn minimized father's behavior and repeatedly failed to follow through with plans to leave him. Father also had failed to provide proof of enrollment in any services and refused to leave the home.

In early January 2019, the children were removed from the custody of mother and father. The children were placed in two separate homes close to each other and had sibling visits once a week.

4. **Instant Petition, Detention, Amended Petition, Adjudication, and Disposition**

On January 4, 2019, the Department filed a seven-count section 300 petition on behalf of the children (petition). In particular, the petition alleged the children were at risk of serious physical harm due to the parents' domestic violence, father's marijuana use, mother's failure to protect the children from father, and B.E.'s ingestion of marijuana. The petition also alleged mother and father emotionally abused their 10-year-old son, putting him at risk of serious emotional damage. As

6

indicated on the petition, the case was handled by the Department's Deaf Services Unit.

At the detention hearing held a few days later, an ASL court interpreter interpreted for mother and father. The juvenile court ordered the children detained from mother and father. The children were placed in foster care. The court ordered the Department to provide referrals to the parents for domestic violence counseling, parenting classes, and drug and alcohol testing.

The following month, in February 2019, the Department filed an amended section 300 petition (amended petition). The amended petition did not include new counts but added factual details to the existing counts. Specifically, the Department added that mother and father had left B.E. alone in a car, where he consumed marijuana edibles and subsequently suffered a seizure and breathing difficulty. The Department also added that, when the oldest child intervened to help mother during a domestic violence incident, father pulled her hair and slapped her face, causing bruising. Additionally, the children had been exposed to father's marijuana smoke and had access to his marijuana, which was left on a table at the house. The juvenile court dismissed the original petition and ordered the amended petition filed.

The Department continued its investigation. In February 2019, a Department social worker interviewed mother, father, the four oldest children, and the paternal grandfather, all of whom reiterated and expanded on what previously had been reported to the Department regarding domestic violence, verbal and physical abuse, and father's drug use. Mother reported she was participating in individual counseling, parenting classes, and a domestic violence program. She had tested negative for drugs

once and missed her remaining four drug tests. Father told the social worker he wanted to stop smoking marijuana and recognized he needed "to do parenting and domestic violence class." Father stated he was " 'hard of hearing' " and used " 'signs and talk at the same time.' " He denied many of the reported incidents of domestic violence and said he and mother " 'argue in sign language.' " Father stated he was participating in an anger management class at CODIE, which class he would soon complete. Father also said he was taking a parenting class, however, it appeared he had started parenting classes the previous year but did not complete the program. Father had missed all four of his random drug tests and was not enrolled in a domestic violence program.

On February 25, 2019, the juvenile court held a combined adjudication and disposition hearing. Mother and father each entered a no contest plea to the amended petition. The juvenile court dismissed three counts, amended the remaining counts slightly, and sustained those counts as amended. The court found the children were persons described by section 300.

The juvenile court ordered the children removed from their parents and ordered family reunification services for both mother and father. The court ordered father to complete a 52-week domestic violence program, a parenting program, individual counseling, mental health counseling and assessment, and weekly drug testing. If father missed a drug test or tested positive for substances, he was required to participate in a full drug rehabilitation program with random testing.[3] Mother was

_____

[3] The first page of father's court-ordered case plan stated father was required to participate in a full drug program "if any test is missed or dirty." On the second page, however, the words

8

granted unmonitored visits with the children; father was granted monitored visits.

## 5. Reunification Period

### a. *February 25 to August 26, 2019*

In late-March 2019, the Department reported father was enrolled in an anger management class through CODIE and was participating in a parenting program through Five Acres Parenting Program. In March and April 2019, father missed several drug tests and, on March 27, 2019, tested positive for marijuana. The record is not clear, but at some point after that, father was referred to a full drug program provided by the House of Uhuru. By late March, father was "waiting for an intake" at the House of Uhuru. In early May 2019, father mentioned to a Department social worker the House of Uhuru had told father he would have to provide his own ASL interpreter. Father did not believe that was correct, stating, "I know they have a legal obligation to provide me with an interpreter. I think they are trying to oppress me, by not having . . . interpreters." By the end of June 2019, however, father told a different Department social worker he was "happy that he now has an interpreter for his drug program."

In August 2019, the Department submitted a report for the court in advance of the six-month review hearing, which was scheduled for August 26, 2019. In its report, the Department stated mother and father had made partial progress with their court-ordered case plans. Both parents had completed parenting

---

"missed or" were crossed out. As noted below, father both missed drug tests and tested positive for marijuana. The parties do not dispute that father eventually was required to participate in a full drug treatment program.

9

programs and were enrolled in individual mental health counseling. In addition, father was enrolled in the House of Uhuru drug program and the CODIE anger management program. Nonetheless, the Department reported mother and father continued to have domestic violence issues and needed conjoint mental health counseling with each other and later with the children. The children had been placed with their paternal grandparents. The Department recommended the juvenile court continue reunification services for the family.

In its August report, the Department also revealed "[t]here has been complication concerning securing ASL interpreting services" for father at the House of Uhuru. In early August, father had expressed frustration " 'with the lack of American Sign Language interpreting services.' " He told a Department social worker, " 'It is not fair to me. It is my right to have an ASL interpreter for each of my sessions.' " He also stated he understood he " 'need[ed] to work on several things' " and said he " 'need[ed] six more months.' " He believed he was making progress, but was " 'frustrated with not being able to have reliable ASL interpreting at [his] program.' " The House of Uhuru also had expressed concerns "that at times they are not able to secure an ASL interpreter" but also noted, at "other times [father] is not present at the program when they do secure an ASL interpreter." At a Child and Family Team meeting, the participants, which included father and mother, discussed how the lack of ASL interpreters presented barriers to father completing his court-ordered services. That meeting was cut short, however, because father was angry and mother "was not able to participate fully . . . due to confrontations between herself and the father."

10

On August 26, 2019, the date of the scheduled six-month review hearing, the case was transferred to the juvenile court "ASL courtroom" and a contested six-month review hearing was rescheduled for October 2, 2019.  At the August 26 hearing, father's attorney raised what he called "an appalling lack of reasonable efforts," stating "father does only speak A.S.L., and, yet, he has been referred by the Department to a rehab where— well, to call it spotty A.S.L. would be a compliment.  In addition, individual counseling—he's making do without an A.S.L. interpreter there."

### b.    *August 27 to October 2, 2019*

On September 16, 2019, a Department social worker met with father, at which time father "was very emotional and cried heavily during the entire conversation."  During their conversation, father stated, " 'I am going to be honest with you. I have not gone to the program.  I do not have a sign language interpreter at the program and I want to learn.  I am overwhelmed.  I am sad.  I am lonely.  I am homeless and sleeping in my car.  I and [mother] broke up.' "  The social worker told father perhaps the drug program in which he was enrolled was "not the right fit for you."  The social worker said, "I need to help you find another program."  In response, father stated, " 'No I don't want to start over.  I want to stay at the House of Uhuru.' "  Similarly, father told the social worker he had stopped going to his mental health counseling because he did not have an interpreter there.  The social worker suggested father consider a drug program in San Diego for the deaf.  Father responded, " 'No, I don't want to go to San Diego.  I have a right to services here.' " During their conversation, the social worker also asked father about his anger management program through CODIE.  She

11

noted that for six months she had been asking father for a release of information to allow her to communicate with CODIE. Father responded, " 'I don't have money to get to Riverside.' " The social worker reminded father, however, that she had offered gas money to him each month.

In a September 25, 2019 last minute report for the court, the Department stated mother and father continued to have domestic violence issues and, on one occasion, father told mother he was suicidal but later said he was only " 'teasing her.' "

On October 2, 2019, the date of the continued six-month review hearing, the juvenile court found good cause to continue the hearing to November 14, 2019. The court also ordered the Department "to assist father with an ASL interpreter for visits and court ordered programs, forthwith."

### c. *October 3 to November 14, 2019*

In a November 2019 report for the court, the Department addressed the status of ASL interpreter services for father. Department social worker Karen Bowman had communicated several times with Kerisha Earles, a clinical supervisor at the House of Uhuru familiar with father's case. Bowman informed Earles the House of Uhuru was required by law to provide interpreter services for deaf persons. In an October 22, 2019 letter, Earles explained she had tried to secure interpreter services but there were no funds for ASL interpreters, stating that "as of July 1, 2019 there is no contract for ASL interpreters." Nonetheless, Earles noted she had obtained volunteer interpreters for some of father's meetings, but father failed to attend those meetings.

Earles explained father had been participating in the House of Uhuru outpatient program for 135 days. Father's

12

current monthly treatment plan was to attend four individual and case management sessions, 12 group counseling sessions, and eight 12-step meetings, and each month to provide two or more random drug tests. Earles reported father had attended one individual and case management session and, during June and July 2019, missed three individual sessions for which interpreters had been provided. Father had attended 47 group counseling sessions and provided only three drug tests, all of which were positive for cannabis. It did not appear father had attended any 12-step meetings. He was offered a variety of support services, including sober living, therapeutic services provided with ASL, community resources, and inpatient services. Father refused all services offered. Finally, based on observations of father during group sessions, Earles reported "he appears to have some ability to communicate evident in speaking to other group members, listening to music with ear phones, talking on the phone, writing skills and answering questions in group. There appears to be a lack of clarification regarding his functional limitations."

Bowman also communicated with a deaf counselor from a drug program located in Orange County. That counselor advised that "deaf persons should file [a] grievance form if they are being denied interpreter services."

In late-October 2019, Bowman spoke with father and encouraged him to file a grievance form as the Orange County counselor had advised. Father asked Bowman to file the grievance for him, but Bowman explained the grievance had to come from father. Later, Bowman again encouraged father to file a grievance. Father was more receptive and stated he would file one. He approved the use of Department ASL interpreters to

13

assist him at the House of Uhuru pending the outcome of his grievance. Father disagreed with Earles's "assumption that he could hear and listen to music." Father stated "he has been very frustrated about the lack of interpreter services at the drug program. He also said he felt he was being disrespectful [*sic*] by the staff at the drug program." Father was resentful about the circumstances leading to the removal of his children and said he and mother were homeless and living in their car. In early November 2019, at the parents' request, Bowman arranged for mother and father to meet with a signing therapist who could provide the parents with conjoint counseling.

Bowman also spoke with paternal grandmother and the four oldest children. The children told Bowman they communicate with father through sign language or "talk[ing] to him verbally" and "that they understand each other." Paternal grandmother stated father can communicate on the phone, "but she would have to talk loud for him to understand what she is saying."

On October 31, 2019, Earles told Bowman the House of Uhuru was "working to get interpreter services for father paid by the program and they are hoping to start having interpreter services middle November." Bowman advised Earles the Department would send its staff ASL interpreters to assist father until the House of Uhuru obtained its own. Bowman noted "father should have a neutral interpreter for his appointments and group meetings."

Prior to the scheduled November 14, 2019 review hearing, the Department filed a motion for a continuance because Earles had become unavailable to testify on November 14. Over father's

objection, the juvenile court granted the Department's motion and continued the six-month review hearing to January 21, 2020.

### d.    *November 15, 2019, to January 21, 2020*

On January 21, 2020, the day of the contested six-month review hearing, the Department filed a last minute report with the court. The Department reported although father had completed his parenting course, he had been inconsistent with his remaining court-ordered services, including individual counseling and a drug program with testing.

The Department's report included a December 23, 2019 progress letter signed by Earles and a House of Uhuru counselor. The progress letter indicated although father had attended 69 group sessions and 4 individual sessions, he had "missed 23 individuals' sessions," including "his last four individual's sessions in which the support of ASL interpreters was present," and "continues to test positive for marijuana." The progress letter also stated father's lack of participation in his individual sessions and 12-step meetings "is affecting his ability to gain skills needed for recovery." In mid-January 2020, the House of Uhuru reported father had not attended services since the date of the December progress letter and had "completely stopped attending individual therapy." A Department social worker spoke with father about his lack of participation at the House of Uhuru. Father told the social worker he had "not learned anything from services at the House of Uhuru as such topics discussed are not helping him. Father added that he does not consume the drugs discussed during group [sessions]. Father stated that such information does not help him, as he needs to know about marijuana. When asked when he last used

15

marijuana, father stated, 'every day, I smoke pot every day. I never stopped.  I smoke three boxes of cigarettes too.' "

As to father's progress with individual counseling, the Department's January 2020 report indicated father began services in March 2019.  His current therapist reported father usually appeared "as a walk-in patient, a few days or weeks after missing his scheduled appointments for which [the service provider] was unable to accommodate father with an interpreter. An interpreter was scheduled according to father's appointments."  The therapist also reported she had met with father five times, but "the language barrier made it difficult to communicate with father," stating "she communicated with father via writing."  The therapist tried to increase father's sessions to twice a week, but father did not attend.

During an unannounced visit to maternal aunt's home, a Department social worker ran into father outside the home. Although an ASL interpreter was not present, father was able to communicate with the social worker, stating "at times he needs an interpreter because he cannot hear 'that' well."

In mid-January, father told the Department social worker he had "given up" and it was best for the children to remain with the paternal grandparents.  Father said he would no longer comply with the juvenile court's orders and stated, " 'I don't think I want the kids because I don't want to be around [mother].  Mom has issues and the kids are not safe with her.' " In the Department's assessment, "mother and father appear to be co-dependent of one another.  It appears that the parent's priority is on one another and not the reunification with the children."

16

**6.      Hearing and Court's Finding of Reasonable Services**

The contested six-month review hearing was held over the course of two days in January 2020.

**a.      *Testimony***

The Department called Earles, the clinical supervisor at the House of Uhuru, to testify.  Earles testified father first enrolled at the House of Uhuru in June 2019.[4]  She stated since that time, father had attended four individual counseling sessions (two of which were intake sessions and two of which were therapeutic sessions) and missed 23 individual counseling sessions.  Earles explained ASL interpreters were scheduled according to father's schedule, multiple copies of which were provided to father.  She also stated father was told either in person or by telephone each time an interpreter would be at a session.  She testified that "[m]ore than three" times an ASL interpreter was present but father missed his scheduled session.

Earles testified a problem arose in July 2019 that affected the House of Uhuru's ability to provide ASL interpreters for father.  Earles explained that, as of July 1, 2019, the contract between the House of Uhuru and the County of Los Angeles that enabled the House of Uhuru to provide ASL services had lapsed.  The lapse lasted through mid-September 2019.  Earles stated when she realized the contract would lapse, she asked a Department social worker if the Department could provide an ASL interpreter until the contract was signed.  Earles said her request "went unanswered for quite some time."  Earles also noted the House of Uhuru tried independently to contract for an ASL interpreter and used other accommodations for father such

---

[4] The reporter's transcript states June "2018."  That appears to be a mistake.

17

as communicating in writing with him during sessions. Earles also stated the House of Uhuru offered a residential program for father as well as individual telephonic counseling sessions with video translation and suggested alternative programs, but he declined or simply did not respond. Earles testified that, in September or October 2019, the Department began providing ASL interpreters for father on a temporary emergency basis, and by mid-October the House of Uhuru again was able to provide ASL interpreters.

Father called the Department's supervising social worker, Karen Bowman, who testified through an ASL interpreter. Bowman testified she first contacted the House of Uhuru in July 2019 to discuss the lack of ASL interpreters for father. She stated the Department provided ASL interpreters for father at the House of Uhuru "for a short period of time" until the House of Uhuru was able to provide their own interpreters. Bowman noted, "It is not a good practice to send our interpreters. Our interpreters work with the social workers. We want dad to feel comfortable without using the social worker's interpreter." She testified the Department also offered father a program in San Diego, which he did not want to attend, as well as low-cost counseling with an Anaheim therapist, whom father called once.

Bowman also testified about father's participation in an anger management program. Bowman stated because there were no domestic violence programs for deaf clients, father could have satisfied his court-ordered domestic violence program through the CODIE anger management classes in which he was enrolled. Bowman explained, however, the Department had been unable to verify father's progress in that anger management program

because, despite having been asked, father never signed a release of information.

Finally, father testified on his own behalf, also through an ASL interpreter. Father stated he enrolled in the House of Uhuru drug program in June 2019 and, at that time, there were no ASL interpreters there to help him. He said he alerted the Department social worker about the lack of ASL interpreters at the House of Uhuru, but he did not hear from the social worker about the ASL interpreters until approximately August and was not aware until October that ASL interpreters were available. Father also testified he was not told every time an ASL interpreter was available. He acknowledged both his individual counseling and his group sessions were held "at the same time, all the time" and he had been provided a copy of his counseling and class schedule.

b. *Argument and Findings*

At the close of testimony, the juvenile court heard argument from counsel. Counsel for the Department argued the Department had provided reasonable services for father and recommended further reunification services for him. Counsel stated, "The social workers in this case have provided the father with referrals, have reached out to service providers, have offered the father when issues arose regarding the interpreter situation at House of Uhuru[, t]hey offered other options." Counsel also argued, although Department ASL interpreters assisted father at one point, it was not advisable to use Department interpreters at the House of Uhuru "because that would essentially be a conflict of interest in issues such as individual counseling where a person has to be open and address personal issues. There is a therapist/client privilege. The [Department] interpreters are

[Department] employees." Finally, counsel noted father had missed many sessions at the drug treatment program when an interpreter was available, and "[i]f the father had a question as to whether an interpreter was going to be there, the father could have called before each session and inquired."

When asked by the juvenile court why the Department waited until June 2019 to address the issue of ASL interpreters at the House of Uhuru, counsel for the Department explained initially (at the February 2019 adjudication and disposition hearing) father was not ordered to enroll in a full drug program. It was only later, after missed tests or positive test results, that father was required to enroll in a full drug program such as that offered by the House of Uhuru. Counsel noted, "It is not clear from the record when that [additional requirement] happened." Counsel also stated it appeared the social worker did not learn until May 2019 that the House of Uhuru did not have an ASL interpreter. Counsel agreed with the court's assessment that "[t]he key issue is when he got into the drug program."

Contrary to the Department, counsel for father argued the Department had failed to provide reasonable services. Father's counsel stated, "[F]ather was essentially not serviced from February until June of 2019 when the social worker finally made contact with the House of Uhuru to inquire about their lack of ASL interpreters. That is essentially five months during the six-month review period, of no services." Counsel later acknowledged, however, during that time frame "father did complete the parenting [course], as well as CODIE [anger management program], and he is enrolled in individual counseling." The juvenile court noted that in February father was ordered to drug test and was not required to enroll in a drug

program until May or June 2019.  Nonetheless, counsel argued it took a Department social worker almost one month to respond to father's concern, expressed in a May 2019 conversation, about ASL interpreters at the House of Uhuru.  Father's counsel stated the House of Uhuru did not have a permanent ASL interpreter at the facility until mid-November 2019, and it was "reasonable for father to become frustrated with all of the efforts he was making and the lack of assistance that he was getting from the Department."  Counsel also noted the original six-month review hearing was scheduled for August 2019, but was continued several times over father's objection.  Counsel requested both "an additional month because the father did not receive the service that he should have received" and "that the court at least provide the months where, from August [2019] to until today's date [January 21, 2020], at least where he was not able to express to the court his frustrations in not receiving those services, that that at least be granted to him, that additional time."

After hearing argument and before making its ruling, the juvenile court continued the matter for two days to review the record and applicable law.

On January 23, 2020, the juvenile court found the Department had offered father reasonable services.  The court found Earles and Bowman credible.  The court stated:  "I find that the Department had offered reasonable services.  The issue is that the program that the father selected had difficulty getting the ASL services into place.  I find, generally, that the Department continue[d] to work with the father when this issue came up and offered options that he chose not to take, and that the program, the Uhuru program, also tried to address the problem until they got the ASL services in place.  I think the real

21

complaint is . . . that the program which had a duty to provide the ASL services under the law took a fair amount of time to get the ASL services, so I think the father's real complaint is at some point if he is not able to complete the program by—when and if the Department recommends to terminate [family reunification], and he has participated diligently in that program, is more of a request for the continuance under [section] 352 for more time, as it is not through any fault of his or the Department that the program failed to offer the ASL on time." The court further stated the House of Uhuru "struggled to get the ASL services in place, but the services ultimately were put in place; that the failure to offer ASL was not through any failure by the Department to offer reasonable services. Throughout, [Department social worker] Bowman remained in contact with the father and offered suggestions and options, and at times offered their own ASL services for their own limited purposes."

The court concluded "the issue is not yet ripe as to whether [father] will have time to complete the program before the Department requests that the court terminate family reunification services. I think the complaint is more that he should be given more time because the program, itself, took too long—took a period of time to get services." The court noted if, in the future, father demonstrated his participation in the House of Uhuru program but was concerned he would not complete the program in time to reunify with the children, the court would consider a request for additional time at that point. The court also distinguished *In re J.P.* (2017) 14 Cal.App.5th 616, on which father relied (discussed below).

The court found mother and father each had made partial progress in their case plans and ordered the continuation of reunification services.

## 7.     Appeal

Father appealed the juvenile court's January 23, 2020 orders, specifically its findings "the department made reasonable efforts."[5]

### DISCUSSION

Father argues the Department failed to provide reasonable services because the drug treatment program to which he was referred (the House of Uhuru) was unable to secure ASL interpreters for him and the Department would not provide its own interpreters for him, thus making it difficult for father to communicate during and learn from the program.  Father argues the juvenile court's finding of reasonable services is not supported by the evidence and improperly diminishes the length of his reunification period.  As discussed below, we disagree with father and conclude substantial evidence supports the juvenile court's finding of reasonable services.

## 1.     Applicable Law

"Family reunification services play a critical role in dependency proceedings.  [Citations.]  At the dispositional hearing, the court is required to order the [Department] to provide child welfare services to the child and his or her parents.  (§ 361.5, subd. (a).)  Services 'may include provision of a full array

---

[5] The parties do not address the propriety of father's appeal.  We conclude this case is similar to *In re T.G.* (2010) 188 Cal.App.4th 687, 695–696, and father properly may challenge the findings contained within the juvenile court's orders made at the six-month review hearing.

23

of social and health services to help the child and family and to prevent reabuse of children.'  (§ 300.2.)  Reunification services should be tailored to the particular needs of the family."  (*In re M.F.* (2019) 32 Cal.App.5th 1, 13.)

"At each review hearing, if the child is not returned to his or her parent, the juvenile court is required to determine whether 'reasonable services that were designed to aid the parent . . . in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent . . . '  (§§ 366.21, subds. (e)(8) & (f)(1)(A), 366.22, subd. (a).)  The 'adequacy of reunification plans and the reasonableness of the [Department's] efforts are judged according to the circumstances of each case.'  [Citation.]  To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult.' "  (*In re M.F.*, *supra*, 32 Cal.App.5th at pp. 13–14.)

"Reunification services need not be perfect."  (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1159 (*Melinda K.*).)  "[T]he mere fact that more services could have been provided does not render the Department's efforts unreasonable."  (*In re Alvin R.*, at p. 973.)  Reunification services should be tailored to each family's specific

needs and circumstances and, to the extent there are obstacles to the provision of reunification services, at least some effort must be made to overcome those obstacles. (*Id.* at pp. 972–973.)

"When it appears at the six-month review hearing that a parent has not been afforded reasonable reunification services, the remedy is to extend the reunification period, and order continued services." (*In re Alvin R.*, *supra*, 108 Cal.App.4th at pp. 973–974; § 366.21, subd. (g)(1).) If, on the other hand, reasonable services have been provided to a parent but the parent fails to make sufficient progress after 18 months of reunification services, the juvenile court generally will terminate the reunification period. (§§ 361.5, subd. (a)(3), 366.22.) Under certain circumstances, the court can order the reunification period extended. (§§ 352, 361.5, subd. (a)(4), 366.22, subd. (b).)

## 2.    **Standard of Review**

We review the juvenile court's finding of reasonable services for substantial evidence. (*Melinda K.*, *supra*, 116 Cal.App.4th at p. 1158.) "We review a reasonable services finding 'in the light most favorable to the trial court's order to determine whether there is substantial evidence from which a reasonable trier of fact could make the necessary findings *based on the clear and convincing evidence standard*.' [Citation.] In determining whether there is substantial evidence to support the court's reasonable services finding, we review the record in the light most favorable to the court's finding and draw all reasonable inferences from the evidence to support the findings and orders. We do not reweigh the evidence or exercise independent judgment, but merely determine whether there are sufficient facts to support the findings of the trial court. [Citation.] The burden is on the petitioner to show that the evidence is

insufficient to support the juvenile court's findings." (*In re M.F.*, *supra*, 32 Cal.App.5th at p. 14.)

### 3. Substantial Evidence Supports the Juvenile Court's Finding

Although father's court-ordered case plan addressed more than father's drug use, our focus here is whether the Department provided reasonable services to address father's drug problems.[6] We conclude substantial evidence supports the juvenile court's finding of reasonable services.

It is undisputed that at the February 25, 2019 disposition hearing, the juvenile court did not order father to enroll in a full drug treatment program. That requirement arose later, after father missed several drug tests in March and April 2019 and tested positive for marijuana in late-March 2019. Although the exact dates are unclear from the appellate record, the evidence supports the juvenile court's finding that "by May [2019] it seemed that the Department and [father] . . . understood that a drug program was required" and by June 2019, father was enrolled in the House of Uhuru's drug treatment program. At the

---

[6] In a heading in his opening brief on appeal, father states the Department failed to provide reasonable services "due to the lack of a consistent ASL interpreter within his drug rehabilitation *and counseling* programs." (Italics added.) However, his argument under that heading addresses only the problems he encountered with ASL services at the House of Uhuru. To the extent father argues ASL services were deficient for his individual counseling sessions, we disagree. The record reveals ASL interpreters were available for father's scheduled counseling appointments. However, father routinely missed those appointments and instead arrived unannounced as a walk-in client, for which an ASL interpreter could not be provided.

start of that program, father raised concerns about the scarcity of ASL interpreters to assist him. The Department assisted father not only by communicating with Earles and others at the House of Uhuru about father's concerns, but also by providing Department ASL interpreters for some of father's sessions, including his two intake sessions. Toward the end of June 2019, father told a Department social worker he was "happy that he now has an interpreter for his drug program."

Unfortunately, on July 1, 2019, the House of Uhuru's contract that covered ASL interpreters lapsed, making it difficult for the House of Uhuru to provide ASL interpreters for father. This contracting issue persisted through approximately mid-September 2019. Nonetheless, at times, the House of Uhuru was able to arrange for volunteer interpreters to assist father, but father did not always appear for those sessions. The House of Uhuru asked the Department to assist by providing interpreters while the contract was being negotiated, but the Department was reluctant to do so because of privacy, conflict of interest, and scheduling issues.

In light of the problems with ASL interpreters at the House of Uhuru, the Department suggested alternative options for father, such as attending programs in other counties and, with the assistance of the Department, filing a grievance against the House of Uhuru. Understandably, father did not want to move to a different county to attend a new program, but he also failed to file a grievance. Moreover, father told a Department social worker he did not want to start over and wanted to stay at the House of Uhuru. The House of Uhuru also provided alternatives for father, suggesting for example that father enter its residential drug treatment program, which had ASL services in place, and

27

offered other accommodations such as written communications and video translation for his sessions. Despite its concerns, in September or October 2019, the Department began providing Department ASL interpreters to assist father at the House of Uhuru. And by mid-October 2019, the house of Uhuru was providing ASL interpreters for father. Again, however, father missed sessions when interpreters were present.

It is clear the ASL services at the House of Uhuru were inconsistent and less than perfect. But perfection is not the relevant standard. (*In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.) Moreover, in this case, father compounded the problem by failing to attend scheduled sessions when ASL interpreters were present. Although father disagreed, Earles testified father was notified when ASL interpreters would be available. (*In re M.F.*, *supra*, 32 Cal.App.5th at p. 14 [on substantial evidence review, "We do not reweigh the evidence or exercise independent judgment"].) During times when the House of Uhuru was unable to provide interpreters for father, the record demonstrates the Department made reasonable efforts to assist father in satisfying his drug treatment program requirement. For example, the Department communicated with the House of Uhuru, emphasizing its obligation to provide ASL interpreters for father; provided Department interpreters for father, despite its own reservations about doing so; and offered father alternative programs. Under the unique circumstances of this case, we conclude substantial evidence supports the juvenile court's finding of reasonable services. (*Melinda K.*, *supra*, 116 Cal.App.4th at p. 1159.)

Finally, we agree with the juvenile court's assessment that this case is factually distinct from *In re J.P.*, *supra*, 14

28

Cal.App.5th 616, on which father relies. In *In re J.P.*, the reunification program to which the Burmese-speaking parent was referred did not offer its program in Burmese and no language assistance was provided. (*Id.* at pp. 625–626.) In addition, both the juvenile court and the Department in *In re J.P.* knew at the time the referral was made that the parent would be unable to access or engage in the program because of the language barrier. (*Ibid.*) The reviewing court called the reunification plan "doomed to fail." (*Id.* at p. 618.) The same is not true here. The House of Uhuru was able to offer and did offer (albeit inconsistently for father) services with the aid of ASL interpreters. In addition, the Department located and suggested other programs that offered ASL services, but father turned them down. Also, at times, the Department provided its own ASL interpreters to assist father.[7]

---

[7] As the Department notes, under the Americans with Disabilities Act, the House of Uhuru has a legal obligation to provide ASL services for its clients who request such assistance. (42 U.S.C. § 12182(b)(2)(A)(iii).) In contrast, a service provider is not required to provide interpreting services for all foreign speaking clients, such as the parent in *In re J.P.*, *supra*, 14 Cal.App.5th 616.

## DISPOSITION

The January 23, 2020 orders are affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.