Filed 2/8/24  In re A.L. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | B314966 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> N.C., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP02815A) |

APPEAL from an order of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  Conditionally affirmed and remanded with directions.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

N.C. (Mother), the mother of minor A.L., appeals from the juvenile court's order at the 12-month review hearing held under Welfare and Institutions Code[1] section 366.21, subdivision (f). Mother argues the juvenile court erred in finding that the Los Angeles County Department of Children and Family Services (DCFS) provided her with reasonable services, and in ordering that her visitation remain monitored. Mother also asserts the juvenile court and DCFS failed to comply with the inquiry requirements of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law.

We conclude Mother's challenges to the reasonable services finding and visitation order are moot, and even if not moot, they lack merit. However, in light of DCFS's concession that there was reversible ICWA error, we conclude the matter should be remanded for a proper ICWA inquiry of known and available extended family members. Therefore, we conditionally affirm the juvenile court's order and remand for ICWA compliance.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Section 300 Petition

Mother and C.L. (Father) are the parents of A.L., a boy born in December 2019. This matter came to DCFS's attention in April 2020 based on a referral alleging that then five-month-old A.L. was present during a violent physical altercation between the parents. When a DCFS social worker first met with Mother about the referral, Mother reported that Father hit her multiple times on her head with his closed fist, and that A.L. was present

---

[1] Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

in the room during the incident. Mother also indicated that she and Father had a history of domestic violence, but did not disclose any details.

While Mother denied any history of mental health issues, the social worker observed that she appeared to have a cognitive delay. The social worker discussed a safety plan and mental health services with Mother, and provided her with a resource packet. Mother's health care provider later reported that Mother had a significant mental health history, but she was not currently receiving services.

In her initial meeting with DCFS, Mother agreed to a seek a restraining order against Father as part of a safety plan. The following week, however, Mother indicated that she was no longer interested in a restraining order, because she intended to relocate and did not want DCFS "in her business." She refused to state whether Father had returned to the home. When the social worker made an unannounced visit to the home, Mother refused to allow her inside.

The social worker later spoke with Father, the paternal grandmother, and the adoptive maternal grandfather. Father denied he ever engaged in domestic violence against Mother. He also reported that he moved out of the home following his release from jail. The paternal grandmother expressed that she was interested in having A.L. placed with her, and that she believed Mother was emotionally unstable. She noted that Father had moved in with Mother following A.L.'s birth because he felt Mother lacked the mental capacity to care for the child on her own. The maternal grandfather indicated that he and the maternal grandmother adopted Mother when she was a baby.

He was aware that Mother was diagnosed with schizophrenia as an adult, but he did not know her current situation.

On May 22, 2020, DCFS filed a dependency petition for A.L. under section 300, subdivisions (a) and (b). The petition alleged that Father had a history of committing domestic violence against Mother in A.L.'s presence, and that Mother failed to protect A.L. by allowing Father to reside in the home and have unlimited access to the child.

## II. Detention hearing and ICWA finding

At the May 28, 2020 detention hearing, both Mother and Father appeared and were appointed counsel. They each submitted a Parental Notification of Indian Status (ICWA-020) form in which they indicated they did not have any Indian ancestry. Based on these responses, the juvenile court found that ICWA did not apply. The court made detention findings for A.L., and ordered monitored visitation for both parents.

DCFS later placed A.L. with his paternal grandmother. There is no indication in the record that DCFS ever asked the paternal grandmother or any other extended family members whether A.L. might have Indian ancestry.

## III. Jurisdictional and dispositional hearing

For its June 25, 2020 jurisdictional and dispositional report, DCFS interviewed Mother about the allegations in the section 300 petition. Mother initially denied that Father hit her during the April 2020 incident, and claimed that they solely had a verbal disagreement. She later admitted that Father hit her with an open hand or fist, but continued to minimize the incident as not being "extremely violent" or involving "excessive force." Mother confirmed that she obtained a restraining order against Father, and that they were no longer in a relationship or living

4

together.  Although DCFS also attempted to interview Father for its report, he did not respond to multiple attempts to reach him.

On July 16, 2020, the juvenile court held a combined jurisdictional and dispositional hearing.  The court sustained the petition as alleged, and declared A.L. a dependent under section 300, subdivisions (a) and (b).  The court removed A.L. from parental custody, and granted family reunification services to both parents.  Mother's case plan included a domestic violence support group, parenting education, mental health services, and individual counseling to address case issues.  The court ordered monitored visitation for both parents a minimum of three times a week on the condition that they not visit together, and granted DCFS discretion to liberalize the parents' visits.

## IV.    Six-month review hearing

In its six-month status review report, DCFS stated that A.L. remained suitably placed in the paternal grandmother's home.  Father had not enrolled in any programs or had any contact with DCFS.  Mother initially failed to respond to DCFS's repeated efforts to contact her.  In mid-February 2021, Mother called the social worker, and said that she wanted to "reinstate" her visits with A.L.  She also indicated that she was taking prescribed medication and participating in her court-ordered services.  Mother's therapist reported, however, that Mother's services terminated due to her lack of participation, and that Mother recently contacted the therapist about reinstating them.

The paternal grandmother informed DCFS that both parents continued to have monitored visitation.  Father visited A.L. on a daily basis for short periods of time before or after work.  Mother also visited A.L., but according to the paternal grandmother, her visits "tend to get cut short due to [her] erratic

5

behavior." While Mother never endangered A.L. during the visits, she exhibited concerning behaviors, such as talking to herself, pulling out her hair, and stating that strangers wanted to sexually assault and impregnate her. In February 2021, the social worker spoke with Mother and the paternal grandmother about these concerns with Mother's visits. The paternal grandmother indicated that she was willing to resume monitoring Mother's visits as long as they took place in a nearby park.

At the six-month review hearing held on March 2, 2021, the juvenile court found that DCFS provided reasonable services. The court further found that both Mother and Father failed to make substantial progress with their case plans, and that continued jurisdiction over A.L. was necessary. The court extended reunification services for both parents, and set the matter for a 12-month review hearing.

## V. 12-month review hearing

In its 12-month status review report, DCFS stated that A.L. continued to do well in the paternal grandmother's care. Father maintained short daily visits with A.L. While Father refused to participate in any court-ordered services, Mother's "cooperation with services and visitation drastically changed" in the past six months. In March 2021, Mother completed programs in domestic violence and parenting education. She continued to participate in individual and mental health counseling, and was taking prescribed psychotropic medication. Mother's therapist reported that, when Mother was not taking medication, she was withdrawn and had difficulty remaining on topic. However, Mother had been compliant with treatment, and the therapist had no current concerns about her.

In April 2021, Mother also enrolled in a residential drug treatment program. She then began having virtual visits with A.L. approximately three times per week. The paternal grandmother reported that Mother was very attentive and appropriate with A.L. during the visits. Mother was not able to have any in-person visits during that time because the program's COVID-19 policy prohibited her from leaving the premises. While participating in the program, Mother consistently tested negative for drugs, and she was in the process of transitioning to a sober living facility. In June 2021, however, Mother withdrew from the program and relocated to a shelter so that she could restart in-person visits. She also began full-time employment. Mother stated that she wanted to demonstrate her intent to reunify with A.L. and her compliance with her court-ordered services.

After leaving the drug treatment program, Mother resumed in-person visits with A.L. in mid-June 2021. As of August 2021, Mother was having monitored in-person visits two times per week. The social worker observed two of the visits, and noted that Mother was attentive to A.L.'s needs. In its report, DCFS recommended that the court terminate Father's reunification services, and continue Mother's reunification services for an additional six months to allow her time to transition to unmonitored visits.

On August 31, 2021, the juvenile court held the 12-month review hearing. The court terminated Father's reunification services. In response to Mother's request for continued reunification services and unmonitored visitation, counsel for A.L. and counsel for DCFS joined in asking that the court extend Mother's reunification services, but not liberalize her visits to

7

unmonitored at that time. A.L.'s counsel explained that he recently spoke with the paternal grandmother, who was supportive of eventual reunification, but expressed concern that Mother was not yet comfortable holding A.L. and did know how to place the child in his car seat. In support of the request for unmonitored visits, Mother's counsel noted that Mother was fully complying with her services and consistently attending in-person visits with A.L. Mother's counsel proposed that protective "measures, such as a P.C.I.T. [parent-child interaction therapy (PCIT)] referral can be put in place . . . to make sure [Mother] is receiving the proper instruction and that all of the concerns that have been raised by minor's counsel can be adequately addressed."

The court found that DCFS provided reasonable services, and that continued jurisdiction over A.L. was necessary. The court also found that Mother was compliant with her case plan, and that "once she started, [Mother] has consistently and regularly visited and she has made significant progress in resolving the issues that [led] to the removal of her son." The court ordered an additional period of reunification services for Mother. The court declined to grant Mother unmonitored visits at that time, but ordered DCFS to assist her in enrolling in a PCIT program. The court also granted DCFS continued discretion to liberalize Mother's visits. The court set the matter for an 18-month review hearing.

Mother appeals from the juvenile court's order at the 12-month review hearing.

## VI. Postappeal orders

DCFS requests this court take judicial notice of the juvenile court's February 23, 2023 orders from the section 366.26 hearing

8

held during the pendency of Mother's appeal. We grant DCFS's unopposed request. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) On our own motion, we also take judicial notice of the juvenile court's January 20, 2022 and August 18, 2022 minute orders.

As reflected in these postappeal orders, on January 20, 2022, the juvenile court held the 18-month review hearing, found that DCFS had not provided reasonable services, and further extended Mother's reunification services. Then, on August 18, 2022, the court held a 24-month review hearing, found that continued jurisdiction over A.L. was necessary, and terminated Mother's reunification services. Finally, on February 23, 2023, the court held the section 366.26 permanency planning hearing. At that hearing, the court ordered a permanent plan for A.L. of legal guardianship with the paternal grandmother, granted Mother unmonitored visitation a minimum of three times per week for three hours per visit, and terminated dependency jurisdiction.

## DISCUSSION

## I. Reasonable services finding and visitation order

Mother raises two arguments with respect to the juvenile court's findings and orders at the 12-month review hearing. First, she contends the court erred in finding that DCFS provided her with reasonable services, primarily because the agency failed to ensure that she had in-person visits with A.L. for a portion of the reunification period. Second, Mother asserts the court erred in refusing to liberalize her visits with A.L. to unmonitored given her substantial progress with her reunification services. We conclude both claims are moot in light of subsequent events, and even if not moot, the claims lack merit.

9

### A. Mother's challenges to the reasonable services finding and visitation order are moot

In challenging the juvenile court's rulings at the 12-month review hearing, Mother contends that the proper remedy is for this court to reverse the reasonable services finding and the visitation order, and to remand the matter for a new status review hearing "to consider return to and/or unmonitored visits for [M]other." In its respondent's brief, DCFS argues that this court cannot provide any effective relief beyond that which Mother already obtained, because the juvenile court granted her additional reunification services at the 12-month review hearing and unmonitored visitation at the permanency planning hearing. Mother did not file a reply brief addressing DCFS's mootness argument. We agree with DCFS that this portion of Mother's appeal is moot.

"A case becomes moot when events ' "render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276.) "[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error." (*In re N.S.* (2016) 245 Cal.App.4th 53, 60.) "For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.*, at p. 276.)

As to reasonable services finding, "[t]he remedy for the failure to provide court-ordered reunification services to a parent is to provide an additional period of reunification services to that parent and to make a finding on the record that reasonable

10

services were not offered or provided to that parent." (*In re A.G.* (2017) 12 Cal.App.5th 994, 1005, italics omitted.)  For a child under the age of three at the time of removal, as A.L. was here, the minimum period of reunification services is six months. (§ 361.5, subd. (a)(1)(B).)  The maximum period of reunification services is presumptively 18 months (*id.*, subd. (a)(3)(A)), but services "may be extended up to a maximum time period not to exceed 24 months" after the original date of removal under certain limited circumstances (*id.*, subd. (a)(4)(A)).  If the child is not returned to the parent's custody within these statutory time limits, the court ordinarily must terminate reunification services and set a permanency planning hearing.  (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 627–628; see § 366.22, subd. (a)(3).)

In this case, despite its reasonable services finding, the juvenile court provided Mother with an additional period of reunification services at the 12-month review hearing.  The court then extended Mother's services for an additional six months at the 18-month review hearing.  By the time the court terminated her services at the 24-month review hearing, Mother had received the maximum period of reunification services allowed under section 361.5.  Mother does not argue that she is entitled to more than 24 months of services, or that there is any relief this court could grant for an alleged erroneous reasonable services finding beyond the additional period of services that Mother already received.  Mother's challenge to the reasonable services finding at the 12-month review hearing is accordingly moot.

As to the visitation order, we likewise cannot grant Mother any effective relief for her claim that the juvenile court erred in refusing to liberalize her visits to unmonitored at the 12-month review hearing.  As DCFS correctly asserts, the juvenile court

11

already provided Mother with the very relief that she seeks by this appeal for the alleged error. At the section 366.26 hearing on February 23, 2023, the court ordered a permanent plan for A.L. of legal guardianship with the paternal grandmother, and granted Mother unmonitored visits a minimum of three times per week for three hours per visit. Because Mother obtained the requested relief in a subsequent proceeding, her challenge to the prior order for monitored visitation is also moot. (See *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488–1489.)

> **B.** **Mother's challenges to the reasonable services finding and visitation order lack merit**

Even if Mother's claims were not moot, they fail on the merits. Viewing the evidence in the light most favorable to the lower court's rulings, we conclude the juvenile court did not err in (1) finding that DCFS provided Mother with reasonable services, and (2) ordering that Mother's visits remain monitored while she continued participating in reunification services.

> **1.** **Reasonable services finding**

At the 12-month review hearing, the juvenile court must "determine by clear and convincing evidence whether reasonable services that were designed to aid the parent . . . to overcome the problems that led to the initial removal and continued custody of the child have been provided or offered to the parent." (§ 366.21, subd. (f)(1)(A).) "To support a finding that reasonable services were offered or provided . . ., 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult.' " (*In re*

12

*A.G.*, *supra*, 12 Cal.App.5th at p. 1001.) The standard is not whether the services " 'were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re J.E.* (2016) 3 Cal.App.5th 557, 566.) We review the juvenile court's reasonable services finding for substantial evidence. (*In re J.P.* (2017) 14 Cal.App.5th 616, 624.)

Here, substantial evidence supported the juvenile court's finding at the August 31, 2021, 12-month review hearing that DCFS provided reasonable services to Mother. Between the six- and 12-month review hearings, DCFS adequately monitored Mother's progress with her court-ordered services, and reported to the court that Mother was in compliance with her case plan. As detailed in DCFS's 12-month status review report, Mother completed programs in domestic violence and parenting education, and continued to participate in individual counseling and mental health services. In April 2021, Mother also enrolled in a residential drug treatment program. While Mother was in the drug treatment program, she could only have virtual visits with A.L. due to the program's strict COVID-19 policy. Upon withdrawing from the program in mid-June 2021, Mother restarted in-person visits. DCFS observed two in-person visits prior to the 12-month review hearing, and found that Mother was appropriate and attentive to A.L. during those visits.

Mother argues the evidence was insufficient to support the reasonable services finding because DCFS failed to provide her with in-person visits for a significant portion of the reunification period. She also asserts DCFS improperly delegated authority over her visits to the paternal grandmother. The record does not support these claims. Rather, it shows that when DCFS spoke with the paternal grandmother for its six-month status review

13

report, she reported that Mother's visits "tend to get cut short" because of her erratic behavior. Prior to the six-month review hearing, DCFS discussed these concerns with both Mother and the paternal grandmother, and it was agreed that the paternal grandmother would continue monitoring Mother's visits at a local park. Between the six- and 12-month review hearings, Mother's residential drug treatment program, not the paternal grandmother, precluded Mother from having in-person visits with A.L. while she was in the program. Once she left the program, Mother was able to resume regular in-person visits without delay.

In challenging the reasonable services finding, Mother also contends DCFS failed to refer her to special parenting classes to address any alleged cognitive needs. The record reflects that, at the 12-month review hearing, A.L.'s counsel expressed concern that, based on a recent conversation he had with the paternal grandmother, Mother lacked certain essential parenting skills during her monitored visits. At the request of Mother's counsel, the juvenile court agreed to address these concerns by referring Mother for PCIT services. The court thus extended Mother's reunification services and ordered DCFS to assist her in enrolling in a PCIT program. The court's decision to order an additional program for Mother that could aid her in reunifying with A.L. does not show that DCFS failed to provide her with reasonable services. Rather, considering DCFS's efforts and Mother's progress, the evidence was sufficient to support the juvenile court's finding that the services provided were reasonable.

## 2. Visitation order

An order granting reunification services to a parent must provide for visitation "as frequent as possible, consistent with the

well-being of the child." (§ 362.1, subd. (a)(1)(A).) However, "[n]o visitation order shall jeopardize the safety of the child." (*Id.*, subd. (a)(1)(B).) "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.)

Mother asserts the juvenile court abused its discretion in ordering that her visits with A.L. remain monitored subject to DCFS's discretion to liberalize, because DCFS gave the paternal grandmother complete authority over whether any visits would occur. As discussed, the record does not support Mother's claim. Instead, the evidence demonstrated that, as of the 12-month review hearing, Mother had made commendable progress with her reunification services, but only recently had resumed in-person visits with A.L. after leaving her drug treatment program. The evidence also showed that DCFS's recommendation at that time was to grant Mother an additional period of reunification services specifically so that she could transition to unmonitored visits. Based on the totality of the record, the court reasonably could determine that A.L.'s safety and well-being necessitated that Mother's visits remain monitored while she received further reunification services, including participating in a PCIT program that could assist her in transitioning to unmonitored visits. The juvenile court's order for monitored visitation subject to DCFS's discretion to liberalize was not an abuse of discretion.

## II.	ICWA inquiry

On appeal, Mother contends, and DCFS concedes, that the juvenile court failed to ensure compliance with ICWA's inquiry provisions because no inquiry was made of available extended family members about A.L.'s possible Indian ancestry.

15

### A. Governing law

ICWA mandates that "[i]n any involuntary proceeding in a [s]tate court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and the right to intervene. (25 U.S.C. § 1912(a).) Similarly, California law requires notice to the child's parent, Indian custodian, if any, and the child's tribe if there is "reason to know . . . that an Indian child is involved" in the proceeding. (§ 224.3, subd. (a).) Both juvenile courts and child protective agencies "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14.)

At the first appearance of each party, the juvenile court must inquire whether that party "knows or has reason to know that the child is an Indian child," and must "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).) Additionally, when a child protective agency takes a child into temporary custody, it must inquire of a nonexclusive group that includes the child, the parents, and extended family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b)). Extended family members include adults who are the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

"If the [juvenile] court makes a finding that proper and adequate further inquiry and due diligence . . . have been

16

conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) We generally review the juvenile court's ICWA findings under the substantial evidence test, " ' "which requires us to determine if reasonable, credible evidence of solid value supports the court's order." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

## B. Remand is required for ICWA compliance

In this case, DCFS acknowledges that it had contact with A.L.'s paternal grandmother and adoptive maternal grandfather, but it did not ask either of them whether A.L. is or might be an Indian child. In the absence of any evidence that DCFS complied with its duty to inquire of these known and available extended family members, as required by section 224.2, subdivision (b), the juvenile court's finding that there was no reason to know A.L. was an Indian child was not supported by substantial evidence. (See, e.g., *In re Jayden G.* (2023) 88 Cal.App.5th 301, 311 [ICWA error where DCFS failed to inquire of available extended family members for whom it had contact information]; *In re J.W.* (2022) 81 Cal.App.5th 384, 389 [ICWA error where DCFS did not ask mother's extended family members about their Indian ancestry, despite having contact with maternal grandmother, uncle, and aunt]; *In re M.M.* (2022) 81 Cal.App.5th 61, 70, review granted Oct. 12, 2022, S276099 [ICWA error where no inquiry was made of extended family members with whom DCFS was in contact].)

Appellate courts have adopted several divergent standards for deciding whether an ICWA inquiry error is prejudicial. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618 [describing four approaches for assessing prejudice at the inquiry stage and

17

adopting a fifth, injury-focused standard].)  In this case, however, we need not decide which standard of prejudice applies.  DCFS does not oppose a limited remand of the matter so that it can conduct an ICWA inquiry of A.L.'s paternal grandmother and adoptive maternal grandfather, and if required, proceed in accordance with ICWA's notice provisions.

Additionally, as a majority panel of this division has reasoned, placing the child with extended family members does not obviate the need for remand because "[e]ven in such cases, tribes may assert tribal jurisdiction or may formally intervene in state court."  (*In re S.S.* (2023) 90 Cal.App.5th 694, 711.) "A 'tribe's rights are independent of the rights of other parties.' " (*Ibid*.)  Under these circumstances and in light of DCFS's concession, we agree that remand for compliance with ICWA and related California law is the proper remedy.

## DISPOSITION

The juvenile court's order at the 12-month status review hearing is conditionally affirmed, and the matter is remanded for compliance with ICWA and related California law.  On remand, the court must promptly direct DCFS to comply with its duty of inquiry in accordance with section 224.2 by interviewing known and available extended family members about A.L.'s possible Indian status.  If that information establishes a reason to know that an Indian child is involved, notice must be provided in accordance with ICWA and section 224.3.  DCFS shall thereafter notify the court of its actions and file certified mail return receipts for any ICWA notices that were sent, together with any responses received.  The court must determine, on the record, whether the ICWA inquiry and notice requirements have been satisfied and whether A.L. is an Indian child.  If the court

18

determines that A.L. is an Indian child, it must vacate its order and conduct a new status review hearing, as well as all further proceedings, in accordance with ICWA and related California law.  If not, the court's original order shall remain in effect.


VIRAMONTES, J.


I CONCUR:


WILEY, J.


19

**STRATTON, P. J., Dissenting**

These proceedings started when A.L. was five months old. He is now four years old. All agree DCFS erred in failing to question extended family members despite having contact information for them. I conclude the error was harmless. The proposed permanency plan is to establish a legal guardianship for A.L. with his paternal grandmother as legal guardian. A.L. has been placed with paternal grandmother almost since the inception of the proceedings. Paternal grandmother has also been monitoring A.L.'s visitation with his mother for most of the last four years.

In enacting ICWA, Congress found "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions." (25 U.S.C. § 1901(4).) ICWA reflects the intent of Congress "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (25 U.S.C. § 1902.) The court is obligated to ask each "participant" in the proceedings whether they have reason to believe the child is an Indian child and to instruct the parties to inform the court if they subsequently receive information that provides a reason to know the child is an Indian child. (*In re Austin J.* (2020)

1

47 Cal.App.5th 870, 882–883, superseded by statute on other grounds as stated in *In re E.C.* (2022) 85 Cal.App.5th 123, 147; see 25 C.F.R. § 23.107(a) (2022).)

As our Supreme Court has recognized, "Congress enacted ICWA in 1978 in response to 'rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In enacting these provisions, " 'Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians.' " (*Id.* at p. 9.)

The concern about separating Indian children from their Indian families, heritage and culture was the topic of extensive Congressional hearings when ICWA was enacted. As one commentator wrote, the " 'wholesale separation of Indian children from their families is perhaps the most tragic and destructive aspect of American Indian life today.' " (Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance (2002) 51 Emory L.J. 587, 601, cited in *In re A.C.* (2022) 75 Cal.App.5th 1009, 1014.)

ICWA authorizes states to provide even more protection than the federal statute provides. In 2006, the California legislature enacted parallel statutes to affirm ICWA's purposes and mandate compliance with ICWA in all Indian child custody proceedings. (*In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) In California, the child protection agency is obligated to ask "the child, parents, legal guardian, Indian custodian, extended family

2

members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b); *In re Dominick D.* (2022) 82 Cal.App.5th 560, 566.)

Here, the question is not error, but whether the error was prejudicial. A prerequisite to reversal of a trial court's decision under California law is a showing of miscarriage of justice. (Cal. Const., art. VI, § 13.)

I find no miscarriage of justice, that is, no prejudice. ICWA itself sets out placement priorities. Section 1915 of title 25 of the United States Code provides that in any adoptive placement of an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with [¶] (1) a member of the child's extended family; [¶] (2) other members of the Indian child's tribe; or [¶] (3) other Indian families." (25 U.S.C. § 1915(a).) Extended family under ICWA includes grandparents. (25 U.S.C. § 1903(2).)

In this case, a legal guardianship by paternal grandmother satisfies first preference. A.L. is in no danger of being separated from his biological family, the evil ICWA was enacted to prevent. (*In re J.W.* (2022) 81 Cal.App.5th 384, 391.) Moreover, even if a tribe had intervened, it would be bound by the placement priorities of the statute if, as the court found here, the first placement priority was in the minor's best interest. Legal guardianship with paternal grandmother does not sever his connection to his biological family; it furthers it. I am hard pressed to conclude that a tribe's inability to participate trumps the stability and benefits afforded by first placement with, and then legal guardianship by, a family member with whom A.L. is familiar.

3

I cannot find that ICWA and its California counterpart were intended to elevate a tribe's right to participate over this child's interest in a secure and safe placement within the bosom of his own biological family. Tribes are included in the proceedings to ensure that no unreasonable and unjustified separation from biological family members occurs. Nothing like that happened here. That the tribe may be the unofficial real party in interest does not supersede the child's best interests. I oppose delaying this biological-family guardianship so that a tribe can come in and suggest someone else within the first preference category. Neither the interests of the tribe nor of A.L. have been prejudicially trampled.

STRATTON, P. J.

4