Filed 5/18/26  In re Ernesto M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Ernesto M. et al., Persons Coming Under the Juvenile Court Law. | B343495 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>D.P.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 23CCJP02994A–B) |

APPEAL from orders of the Superior Court of Los Angeles County.  Stephen Marpet, Commissioner.  Affirmed.

Caitlin Christian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

D.P. (Mother) appeals from the juvenile court's orders at a combined six-month and 12-month review hearing held for her minor children under Welfare and Institutions Code section 366.21, subdivisions (e) and (f).[1] On appeal, Mother contends the juvenile court erred in finding that the Los Angeles County Department of Children and Family Services (DCFS) provided her with reasonable services because the agency failed to make and implement a reunification plan tailored toward Mother's specific needs as a developmentally disabled person. We conclude there was substantial evidence to support the juvenile court's reasonable services finding, and accordingly, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Section 300 petition

Mother and Francisco M. (Father) are the parents of two children, Ernesto M. (a boy born in January 2012) and Ana M. (a girl born in May 2015). Mother was previously diagnosed with an intellectual disability and receives Regional Center services. The children were first declared dependents of the juvenile court in 2015, and were removed from the parents based on Father's domestic violence against Mother and Mother's failure to protect the children from Father. The court returned the children to the parents' custody in 2017 and then terminated jurisdiction.

The current matter came to DCFS's attention in August 2023 after Mother was hospitalized due to methamphetamine use. As of 2023, Mother had been residing with the paternal

---

[1]    Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

grandparents for 11 years.  The children also resided with Mother in the paternal grandparents' home.  In July 2023, the paternal grandmother forced Mother to leave the home because of her drug use.  In an August 2023 interview with DCFS, Mother initially denied any drug history, but later admitted she used cocaine while the children were present in the home.  A maternal aunt told DCFS that Father supplied Mother with the drugs.  The maternal aunt also noted that Mother was not capable of caring for the children on her own and was "barely able to care for herself" due to her developmental delays.

After Mother was released from the hospital, she began staying in a group home for developmentally disabled adults.  The children continued residing with Father in the paternal grandparents' home.  In an August 2023 interview with DCFS, Mother's parent trainer, Maria Marquez, reported that she had been working with Mother through the Regional Center for about 12 years.  Marquez assisted Mother three days a week, and she observed that Mother was appropriate with the children and able to meet their basic needs.  However, due to her disability, Mother could be easily distracted, and the paternal grandmother had always been there to assist Mother in caring for the children.

On September 5, 2023, DCFS filed a section 300 petition for the children, alleging that they were at substantial risk of harm based on Mother's substance abuse and Father's failure to protect the children from Mother.  At a September 20, 2023 detention hearing, the juvenile court detained the children from both parents and placed them with the paternal grandmother.  The court initially ordered Father to reside outside the paternal grandparents' home, but later allowed Father to return to the home on the condition that he test negative for drugs and alcohol.

The court granted Mother monitored visits with the children. At a subsequent hearing held on October 23, 2023, the court ordered DCFS to provide Mother with appropriate referrals for services, including weekly random drug testing, and to assist Mother with a visitation schedule.

## 2. Jurisdictional and dispositional hearing

For its October 2023 jurisdiction/disposition report, DCFS interviewed the family regarding the allegations in the petition. In her interview, Mother admitted she used drugs in the past, but continued to deny any recent usage. She also declined to submit to a drug test at that time. The social worker observed that Mother was able to engage in conversation, but had difficulty explaining her thinking and elaborating on her answers. Even though Mother requested that the interview be conducted in English, she was better able to respond when the social worker re-asked certain questions in Spanish. Mother related that she wished to see the children, but she could not care for them on her own and wanted them to remain with Father and the paternal grandmother. In his interview, Father denied that he was aware of any drug use by Mother prior to her August 2023 hospitalization.

In addition to interviewing the family, DCFS spoke with Mother's group home supervisor, Melissa Gordon. She stated that the home was working with Mother on her daily living skills such as obtaining a job and transitioning to her own apartment. Gordon indicated that if Mother had to participate in court-ordered services, the home could not link her with those services, but could assist with transportation. For its report, DCFS also obtained a letter from Mother's Regional Center service coordinator, Deisy Villanueva, verifying that Mother began

4

receiving services in 1994 and would continue to do so throughout her lifetime due to her intellectual disability. Villanueva provided a copy of Mother's psychological evaluation, which was conducted in 1994 when Mother was 12 years old to determine her eligibility for services. According to the evaluation, Mother had the cognitive and adaptive skills of an eight-year-old, and she was diagnosed with mild mental retardation.

In its report, DCFS stated that, due to Mother's intellectual disability, she did not appear to understand the impact that her drug use had on the children and their safety. DCFS recommended the juvenile court sustain the petition and provide Mother with enhancement services, including weekly drug testing, developmentally appropriate parenting classes, and individual counseling to address case issues.

Prior to the adjudication hearing, DCFS submitted several addendum reports providing updated information on the family. As of November 2023, Father had left the paternal grandparents' home and was not assisting with the care of the children. He later informed the social worker that he was not interested in participating in services, and instead wanted the paternal grandmother to become the children's legal guardian. During this period, the social worker set up weekly drug testing for Mother, mailed the drug testing referral to her, and made various attempts to call her to discuss the case. However, Mother was not responsive to these efforts to reach her.

In December 2023, the social worker spoke with the Regional Center's START program coordinator, who reported that she was assisting Mother in obtaining services, and that Mother only recently became aware that she had to submit to drug testing. A few days later, the social worker met in person

5

with Mother and reviewed the drug testing referral with her. The social worker also met with Mother's caregiver at her group home, who indicated that he was helping Mother call the testing line, but Mother was refusing to attend the tests. During the meeting with Mother, the social worker asked about her goals for the children and if she would be able to care for them. Mother replied that she was busy because she had to do laundry, and she wanted the children to remain with the paternal grandmother.

In January 2024, Mother began weekly drug testing with the help of her case manager at the group home, and had four consecutive negative tests. However, in February 2024, Mother tested positive for both methamphetamine and marijuana despite denying that she used any drugs. As of March 2024, Mother was consistently visiting the children, but she tended to focus her attention on Ernesto rather than engaging with both children during the visits.

On March 18, 2024, the juvenile court held a combined jurisdictional and dispositional hearing. The court sustained the petition as pled and declared the children dependents of the court under section 300, subdivision (b). The court removed the children from the parents and ordered that they remain placed with the paternal grandparents under the supervision of DCFS. The court granted both parents reunification services, including monitored visitation with the children. Mother's case plan consisted of a six-month drug and alcohol program with weekly on-demand testing, a 12-step program with a sponsor, a developmentally appropriate parenting class, and individual counseling to address case issues.

### 3.    Status review reports

On April 9, 2024, the social worker contacted Villanueva, Mother's Regional Center service coordinator, to inquire what support the Regional Center could provide to assist Mother in completing her court-ordered case plan. The following day, Villanueva advised the social worker that she contacted Shields for Families and confirmed that Mother was on their waiting list for therapy. Villanueva noted that she also offered Mother referrals for substance abuse programs and parenting classes, but Mother declined to participate at that time. Villanueva planned to contact the START program for assistance in offering resources to Mother and ensuring that she understood the case plan.

On April 15, 2024, the social worker met in person with Mother and members of her support system, which included Villaneuva, Ricardo Ruiz (the START program clinical team leader), and Tair Funches (Mother's group home caregiver). The social worker provided Mother with a copy of the court's orders and reviewed the case plan with her. Mother indicated that she understood the court's orders, but did not understand why she had to complete a substance abuse program or attend a 12-step program because she did not use drugs. Although the social worker reminded Mother of her recent positive test for methamphetamine, Mother did not appear to understand. During the meeting, the social worker also provided Mother with several referrals for substance abuse programs, counseling services, and parenting classes. Ruiz and Funches indicated that they could assist Mother in enrolling in services if she agreed.

On April 29, 2024, Villanueva informed the social worker that she would be reaching out to Mother to again offer her

7

services. Villaneuva also reported Mother had been assigned a therapist at Shields for Families, but despite multiple reminders, Mother had not responded to the agency's attempts to schedule an intake assessment with her.

Between April and May 2024, Mother tested negative for drugs on four occasions, but missed a number of other tests. On May 17, 2024, the social worker met with Mother about her compliance with her case plan. Mother indicated that she had not enrolled in any services because she had been busy cleaning the house, washing clothes, and visiting the maternal grandmother. She also stated that she was "done" with drug testing because she was tired. The social worker again reviewed the case plan with Mother and provided her with an additional referral for individual counseling and a parenting class.

On June 10, 2024, the social worker met with Mother and asked her about her progress with services. Mother replied that she had not had an opportunity to call any service providers because she was busy. With Mother's consent, the social worker assisted her in calling a substance abuse program to begin the intake process. During the call, Mother was advised that she would be contacted within the next week for an initial assessment and then connected to a program in her area.

On June 16, 2024, Mother showed up outside the paternal grandparents' home where she began hitting the windows and screaming for the children. When the police arrived, Mother assaulted the responding officer and resisted arrest. Mother later admitted to the social worker that she was under the influence of drugs during the incident.

Throughout June 2024, Mother failed to appear for her on-demand drug tests. During a July 10, 2024 meeting with the

8

social worker, Mother indicated that she still had not enrolled in any services, but she could not explain why. When asked about her missed drug tests, Mother responded that she was busy visiting the maternal grandmother and cleaning the restroom. During the meeting, the social worker provided Mother with several additional referrals for a parenting class.

On July 29, 2024, Mother told the social worker that she had enrolled in a parenting class and substance abuse program, but could not recall the names of the providers. That same day, the social worker spoke with Angela Johnson from the VL Open Hearts program, which was assisting Mother with her services. According to Johnson, Mother recently began attending an online parenting class. Johnson sat with Mother during the class and explained the material to her because Mother would not be able to comprehend it on her own. Mother had not enrolled in a substance abuse program, but she had started attending Alcoholics Anonymous (AA) meetings twice a week accompanied by Johnson. Mother had not enrolled in any other services.

On August 20, 2024, the social worker met with Mother about her failure to drug test. Mother replied that she was busy washing her clothes. She also indicated that she called the testing line, but did not need to test that day. At the social worker's request, Mother demonstrated how she checked whether she was required to test, and appeared to be able to independently call the line for drug testing.

On August 21, 2024, the juvenile court heard a section 388 petition filed by DCFS to modify Mother's visitation. At the hearing, Mother's counsel advised the court that she recently learned that Villanueva was no longer serving as Mother's Regional Center service coordinator, and that it took considerable

effort to get a new coordinator assigned. Mother's counsel also argued that although the Regional Center and its community partners had been assisting Mother in enrolling in services, it was DCFS's responsibility to do so. After hearing from counsel, the court granted the petition and ordered that Mother's visits with the children be limited to phone contact until she enrolled in a substance abuse program and tested negative for drugs and alcohol. The court also ordered DCFS to provide Mother with referrals for a drug program and to assist in setting up drug testing.

In a September 2024 status review report, DCFS informed the court that Mother was assigned to a new Regional Center service coordinator, Natalie Yousef, on August 20, 2024. In an August 2024 e-mail exchange with the DCFS social worker, Yousef explained that due to Mother's intellectual disability, Mother had difficulty retaining information and seemed "a bit overwhelmed with all that is being asked of her." However, Yousef also stated that "[a]s long as [Mother] wants to put in the work to follow through with the conditions of her DCFS case and ultimately regain custody of her children, we are all supplying her with the necessary tools and resources to make that happen."

On August 26, 2024, the social worker assisted Mother with submitting a referral to a substance abuse program, and Mother was scheduled for an intake appointment two days later. Although the social worker provided the appointment information to Mother as well as to her Regional Center service coordinator and providers, Mother did not follow through with enrolling in the program. Additionally, while Mother had been attending AA meetings since July 2024, she reported that she had not participated in the meetings because she was not ready

10

to share. She also continued to miss the majority of her on-demand drug tests. Mother was attending a parenting class with the assistance of VL Open Hearts, which provided her with additional services such as child development resources and parenting skills workshops. Yet when asked what she learned in the class and how she would implement those lessons with her children, Mother was only able to articulate " 'not hitting kids, be good, love each other.' " With respect to individual counseling, Yousef indicated that Mother was linked to mental health services through the Regional Center, but due to inconsistent participation, Mother would not be assigned a therapist until she agreed to regular ongoing services.

In a last minute information report filed in September 2024, DCFS informed the court that Mother recently tested positive for cocaine in two on-demand tests. DCFS also reported that, although Mother attended a screening for a substance abuse program on September 6, 2024, she failed to appear for her treatment assessment appointment a few days later. When the social worker followed up with Mother about the program, she stated that she was not sure if she wanted to participate because it would require a lot of time and she was busy going out, washing clothes, and staying home to watch movies. On September 16, 2024, the juvenile court set a contested six-month review hearing at Mother's request.

In its November 2024 status review report, DCFS provided an update on Mother's progress with her case plan. In late September 2024, Mother enrolled in a substance abuse program consisting of two hours of early intervention services each week. Mother's substance abuse counselor did not recommend an outpatient program for Mother due to her intellectual disability,

11

and instead determined that the one-on-one support provided by her current program best suited her abilities. In September 2024, Mother also agreed to participate in individual counseling. Yousef advised DCFS that the START program would provide a referral and assist Mother in enrolling in counseling using her managed care plan. Due to an issue with Mother's insurance coverage, she did not begin individual counseling until mid-November 2024. During this period, Mother continued to attend AA meetings and an online parenting class with the assistance of her caregiver from VL Open Hearts. In October 2024, the facilitator for the parenting class informed DCFS that Mother might benefit from retaking the class in person because she did not appear to understand the lessons. However, following a one-on-one meeting, the facilitator determined that Mother had a fair understanding of the class material, and provided a letter of completion for Mother in November 2024.

### 4. Contested review hearing

On November 19, 2024, the juvenile court held a combined six-month and 12-month review hearing. In addition to admitting documentary evidence offered by the parties, the court heard testimony from Araceli Arriaga, the DCFS social worker, and Paul Martinez, a Regional Center forensic specialist.

In her testimony, Arriaga stated that she worked for DCFS for three years, but had not worked with a parent who received Regional Center services prior to Mother. During her initial review of the case, Arriaga made contact with Mother's Regional Center service coordinator, Villanueva, who provided background on what services Mother was receiving at that time. Arriaga offered Mother the same type of program referrals that she offered to parents who did not have an intellectual disability.

12

Arriaga explained that once the program providers conducted an intake with Mother, they would decide what services she needed based on her cognitive abilities. Arriaga did not expect the Regional Center to find appropriate programs for Mother to attend as part of her case plan. Rather, Arriaga's goal was to work together with the Regional Center to ensure Mother was enrolled in her court-ordered programs if she was willing to participate in those services. Arriaga could not recall if she had contact with the Regional Center between May and July 2024. Arriaga did, however, meet with Mother on a monthly basis about her progress with her case plan, and when Mother consented, Arriaga would also meet with her caregivers at the group home. In addition, Arriaga kept in contact with Mother's caregiver at the START program, which was assisting Mother with her case plan. Arriaga stated that Mother currently had two parent support persons to help her with her visits and services, along with the 24-hour support provided by the group home. Arriaga believed Mother could benefit from additional support from the Regional Center because Mother often expressed that she felt overwhelmed.

In his testimony, Martinez stated that he was a forensic specialist at the Regional Center where Mother received services. Based on his review of Mother's case file, Martinez did not believe that Mother could independently enroll in her court-ordered programs, and that she would need someone to walk her through the process each time. Mother also would need assistance complying with weekly on-demand drug testing. Generally, DCSF and the Regional Center should be able to work together to locate appropriate services for a parent. However, the Regional Center did not have a legal obligation to provide parents

with reunification services. Due to Mother's intellectual disability, she likely would need to attend specialized programs in substance abuse and parenting. Martinz had seen parents with Mother's level of disability reunify with their children when they had the support of the Regional Center and DCFS.

After hearing the witness testimony and the argument of counsel, the juvenile court found that continued jurisdiction over the children was necessary, and that it would be detrimental to return the children to the parents' custody at that time. The court further found that DCFS provided reasonable services to the parents. The court terminated reunification services for Father based on his lack of compliance with his case plan, and ordered continued reunification services for Mother. The court also ordered DCFS to continue assisting Mother with her reunification services by providing " 'hands on' " help with her programs and visits. The court set a nonappearance progress hearing for January 2025 to address Mother's progress with her case plan.

Mother filed a timely appeal.

## DISCUSSION

On appeal, Mother challenges the juvenile court's finding at the combined six-month and 12-month review hearing that DCFS provided her with reasonable services. Mother contends that the evidence was insufficient to support a reasonable services finding because DCFS failed to make a good faith effort to develop and timely implement a reunification plan tailored to Mother's needs. Based on the totality of the record in this case, we conclude the juvenile court's reasonable services finding was supported by substantial evidence.

14

## 1. Governing law

At the six-month and 12-month review hearings, the juvenile court must "determine by clear and convincing evidence whether reasonable services that were designed to aid the parent … in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent." (§ 366.21, subds. (e)(8), (f)(1)(a).) "To support a finding that reasonable services were offered or provided … 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult.' " (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.)

The agency "must make a ' " 'good faith effort' " ' … to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success." (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.) Moreover, "[r]eunification services should be tailored to the particular needs of the family," which includes "accommodat[ing] the special needs of disabled … parents." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425–1426.) "The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' " (*Id.* at p. 1426.) The standard is not whether the services " 'were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re J.E.* (2016) 3 Cal.App.5th 557, 566.) We review the juvenile court's reasonable services finding for substantial evidence. (*In re J.P.* (2017) 14 Cal.App.5th 616, 624.)

15

## 2. Substantial evidence supported the finding that reasonable services were provided to Mother

In this case, the juvenile court initially detained the children from the parents in September 2023. Early in the case, DCFS made contact with several members of Mother's support team, including her Regional Center service coordinator, her START program coordinator, and her group home supervisor, to discuss what services were available to Mother at that time. The social worker also provided Mother with a resource packet, set up weekly on-demand drug testing for her, and began meeting with Mother on a regular basis about the case. At the March 2024 adjudication hearing, the court ordered reunification services for both parents. A few weeks later, in April 2024, the social worker met in person with Mother and her support team, reviewed the reunification plan with them, and provided Mother with referrals for services in accordance with that plan. Then, over the next several months, DCFS worked with Mother's support team to assist Mother with enrolling in services and complying with her reunification plan, even where compliance proved difficult.

Mother's case plan required her to participate in drug and alcohol services, including a six-month substance abuse program, a 12-step program, and weekly on-demand drug testing. In April 2024, both the social worker and Mother's Regional Center service coordinator offered her referrals for substance abuse programs, but Mother declined to participate at that time because she did not believe she had a drug problem. Between June and September 2024, the social worker made repeated efforts to assist Mother with contacting a substance abuse program to begin the enrollment process, but Mother did not follow through with her scheduled intake and assessment appointments. In late September 2024, Mother did enroll in an

16

early intervention drug treatment program which, according to the program counselor, was best tailored to meet Mother's cognitive abilities because it provided one-on-one support. With the assistance of VL Open Hearts, a program funded by the Regional Center, Mother also began attending AA meetings on a regular basis in July 2024. During this period, Mother did not consistently submit to drug testing, even though her support team at VL Open Hearts and the group home were available to assist with calling the referral line and transporting Mother to the testing site. As Mother's Regional Center service coordinator explained, these caregivers could "ensure [Mother] has the tools she needs" for drug testing "as long as [Mother] is willing to comply."

In addition to drug and alcohol services, Mother was required to attend a parenting class as part of her case plan. The social worker provided Mother with referrals for this service in April, May, and July 2024. Mother enrolled in an online parenting class in July 2024, and she consistently attended the class with the aid of Johnson, her caregiver at VL Open Hearts. Johnson advised DCFS that she sat with Mother during the class and explained the material to her. VL Open Hearts also provided Mother with additional parenting services, such as child development resources and parenting skills workshops. The facilitator for the parenting class later informed DCFS that Johnson did not always appear to assist Mother during the lessons, and that Mother might need to retake the class in person. However, after meeting with Mother on an individual basis, the facilitator found that she had a fair understanding of the material and provided a certificate of completion for the class in November 2024.

Another component of Mother's case plan required her to attend individual counseling to address case issues. On appeal, Mother claims that DCFS did not provide her with timely access to this service because it "failed to intervene for eleven months, while Mother languished on the waiting list for a therapist." This claim is not supported by the record. In April 2024, one month after the adjudication hearing, Mother's Regional Center service coordinator, Villanueva, informed DCFS that Mother was on a waitlist for therapy at Shields for Families. Villanueva also stated that she was trying to get Mother "moved up in line" given that Mother now had a court order for therapy. A few weeks later, Villanueva reported that, although Mother had been assigned a therapist through Shields for Families, she had not responded to their attempts to schedule her for an intake assessment. Over the next few months, the social worker continued to meet with Mother and offer her referrals for services, including for individual counseling, but Mother often stated she was too busy to participate in services. In August 2024, Mother's new service coordinator, Yousef, reported that Mother was linked to mental health services through the Regional Center, but Mother needed to agree to participate in regular ongoing services. Once Mother agreed to participate in therapy in September 2024, Yousef advised the social worker that the START program would be able to assist Mother with the enrollment process using her managed care plan. Due to insurance coverage issues, there was some additional delay in finding a therapist for Mother, but she began individual counseling in November 2024.

Mother argues that DCFS overlooked certain services that were essential to reunification such as a psychological evaluation,

18

housing assistance, and Spanish-language programs.  However, throughout the proceedings, Mother's counsel never asked the juvenile court to order these services for Mother as part of her reunification plan.  While the parties disputed whether the services provided to Mother were reasonable at the November 2024 review hearing, none of them argued that an updated psychological evaluation was necessary to determine the scope of Mother's intellectual disability.  Nor did any of the parties argue that Mother could not comply with her case plan because of a language or housing barrier.  In any event, the record showed that Mother was able to communicate in English even though her primary language was Spanish, and that the Regional Center was providing Mother with housing assistance.

Moreover, contrary to Mother's characterization on appeal, this was not a case where DCFS simply provided Mother with a list of referrals and then left it to the Regional Center to decide what services, if any, could meet Mother's needs.  Rather, the record reflects that DCFS made a good faith effort to work with the various members of Mother's support team at the Regional Center, the START program, the VL Open Hearts program, and Mother's group home to provide her with services that were consistent with the court-ordered case plan.  The social worker also met with Mother on a regular basis to review the case plan and reiterate the importance of participating in reunification services.  When Mother agreed to engage in those services, the social worker along with Mother's support team were able to enroll her in programs that accommodated her intellectual disability, such as a substance abuse program that provided one-on-one support and a parenting education class that allowed for an aide to be present to explain the material.  Although there

were some delays and DCFS arguably could have done more, the standard is not whether the services " 'were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re J.E.*, *supra*, 3 Cal.App.5th at p. 566.)  On this record, the juvenile court's finding that DCFS provided Mother with reasonable services was supported by substantial evidence.

## DISPOSITION

The juvenile court's findings and orders at the November 19, 2024 review hearing are affirmed.


VIRAMONTES, J.


WE CONCUR:



STRATTON, P. J.



SCHERB, J.