Filed 6/1/26  M.O. v. Superior Court CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| M.O.,<br><br>      Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>      Respondent,<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al.,<br><br>      Real Parties in Interest. | B352052<br><br>(Los Angeles County<br>Super. Ct. No. 24CCJP02799C) |

ORIGINAL PROCEEDINGS in mandate.  Linda Sun, Judge.  Petition denied.

Los Angeles Dependency Lawyers, Michael Hefty; Law Office of Martin Lee and Martin Lee for Petitioner.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Willam D. Thetford, Principal Deputy County Counsel, for Real Party in Interest.

The Children's Law Center of Los Angeles, Liz Lopez and Etty Shalev for Minor.

_____

## INTRODUCTION

M.O. (Mother) filed a writ petition to challenge the trial court's finding that DCFS provided her reasonable services before setting a permanency planning hearing under Welfare and Institutions Code section 366.26.[1]  Mother argues that the Los Angeles County Department of Children and Family Services (DCFS) was obligated to assist her in securing a psychiatric evaluation.  We deny the petition because, among other reasons, Mother successfully objected to the inclusion of any psychiatric evaluation in her case plan and the psychologist did not recommend adding a psychiatric evaluation to Mother's reunification plan.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    Dependency proceedings

Mother has three children.  Her two older children were 13-month-old twins with open dependency cases when this case began.  Elena O. is the subject of this writ, and she was one-week-old when DCFS filed this dependency petition.  On May 28, 2025, DCFS's petition alleged that (1) Elena was born with a positive toxicology for marijuana, (2) Mother's abuse of alcohol and marijuana endangered Elena, (3) Mother's mental and

_____

[1]    All further undesignated statutory citations are to the Welfare and Institutions Code.

emotional problems placed Elena at risk, and (4) Mother physically assaulted the maternal grandparents in the presence of Elena's two siblings.  In the detention report, DCFS reported that Mother was noncompliant with her case plan in the cases for Elena's siblings.  In the same report, Mother stated she recently met with a "psychiatrist [to] do a psychological assessment." At the initial hearing, the trial court detained Elena from Mother and found that the father was unknown.

In the jurisdictional report in this case, a social worker in the siblings' case stated that Mother had not completed her "730 psychiatric evaluation" with "Dr. Gonzalez," and Mother had canceled her appointments for the evaluation.  The social worker also stated that Mother's appointment had been rescheduled several times, but was currently scheduled for June 27, 2025. Dr. Inez Gonzalez completed the evaluation on the June date, and she is a clinical psychologist with a Ph.D.  She is not a medical doctor or psychiatrist capable of prescribing psychiatric medication.  To avoid ambiguity about her profession, we refer to Inez Gonzalez as a psychologist rather than a doctor, while acknowledging that she has a doctorate and the parties are correct to define her title as "Dr."

Regarding communication with Mother, Mother did not speak to or meet with the social worker to discuss the petition prior to the jurisdictional report.  DCFS had some text correspondence with Mother, but according to DCFS, she "does not respond right away, as such texts have been limited to one a day."  In addition, Mother only visited Elena once prior to the filing of the jurisdictional report.

In a last minute report prior to the jurisdictional hearing, the social worker charged with assisting Mother with services

3

stated she texted Mother multiple times, but she was unable to meet with Mother. One meeting was set, but the social worker canceled it due to a medical emergency. Thereafter, the services social worker met with Mother, and the social worker concluded that Mother was struggling with her mental health. The meeting was brief because Mother had a difficult time discussing the case.

On July 17, 2025, the trial court sustained allegations that Mother's substance abuse endangered Elena under section 300, subdivisions (b) and (j), and Mother's mental and emotional problems endangered Elena under section 300, subdivision (j). Then, the trial court removed Elena from Mother's custody.

In the siblings' case, the trial court ordered a case plan which included a drug and alcohol program with aftercare, weekly drug testing, a parenting course, a psychiatric evaluation, an order to take recommended psychotropic drugs, and individual counseling.[2] During reunification in the siblings' case, the trial court ordered a psychological evaluation, asking the psychologist for a "Psychological evaluation of mother to determine mental health issues and/or diagnosis" among other issues. The psychiatric evaluation did not take place in the siblings' case, and the parties do not necessarily agree on the reason why this occurred.[3]

---

[2] We grant the unopposed request for judicial notice for the trial court's order appointing an expert. (Evid. Code, § 452, subds. (c) & (d).)

[3] In their reply brief, DCFS claims the trial court "changed" the order from a psychiatric evaluation to a psychological evaluation. At argument for the dispositional hearing, Mother's

4

For the case plan in Elena's case, DCFS recommended that the trial court order a drug and alcohol program with aftercare, weekly drug testing, a psychiatric assessment, an order to take appropriate medication, and individual counseling. During the dispositional hearing, Mother's counsel objected to a psychiatric evaluation while noting that a psychological evaluation was about to take place for Mother in the siblings' case. Mother's counsel elaborated, "In the sibling's case, the department had suggested that we use Dr. Inez Gonzalez who is a psychologist due to the difficulty and near impossibility of locating a psychiatrist. So … the record is clear, I would ask that the box be marked for psychological assessment and not psychiatric." In response, the trial court ruled, "All right, I will do that."

At the dispositional hearing, the trial court ordered Mother to complete a drug and alcohol program with aftercare, weekly drug testing, a parenting program, a psychological assessment with an order to take all prescribed medication, and individual counseling. The trial court did not order a psychiatric evaluation. In addition, Mother was to get credit for any services completed in the siblings' cases.

For the six-month review status report, DCFS attached psychologist Gonzalez's entire evaluation. The psychologist concluded that Mother's diagnosis was Unspecified Mood Disorder, which was a provisional diagnosis. She stated Mother "would benefit from ongoing individual therapy with a licensed

---

counsel argued that DCFS suggested the change from a psychiatric evaluation to a psychological one. We need not reach the question of whether this change was done at the trial court's order, DCFS's recommendation, or for some other reason.

mental health provider," a "trauma-informed approach is recommended," and "[t]herapy should also include evidence-based family therapy." For other services, Gonzalez stated, "[c]ontinued participation in substance abuse treatment and maintenance of sobriety is advised." Gonzalez also wrote that a psychiatric evaluation "should be considered to determine whether psychotropic medication could support mood stability." In addition, Gonzales noted that Mother "does not currently present with acute mental health problems." DCFS included a heading regarding Mother's progress on her case plan entitled, "Mental Health Counseling: Psychological Assessment, Psychiatric Evaluation." Under this heading, DCFS noted that the psychologist's report provided that a "psychiatric evaluation should be considered."

In the same status report filed on December 17, 2025, the social worker noted that since July 2025, Mother refused to speak with social workers to discuss her case plan and visitation. During their limited communications, Mother did state she was uncomfortable with the social worker who assisted her with her case plan. In response, DCFS assigned a different social worker for Mother, but communication between DCFS and Mother was still quite limited after the change. Mother told DCFS she would not answer phone calls from them, and this was largely true. Consequently, DCFS reported that Mother "has not made herself available" during this period.

In the same report, DCFS summarized Mother's progress on her case plan. Regarding the drug program, Mother began treatment in January 2025, but was discharged in April 2025 because she did not participate in individual therapy, group therapy, the twelve-step program, or aftercare. While she

reenrolled in another outpatient drug program in July 2025, her participation was inconsistent.  For example, during November 2025, Mother came to the drug treatment program only once.  Mother tested positive for marijuana nine times, she missed five drug tests, and she tested negative six times.  Mother enrolled in weekly individual and group therapy in October 2025, and she remained enrolled in the program at the time of the report.  In addition, a service provider told DCFS that Mother did not say she needed mental health services, but after talking to DCFS, the service provider would connect Mother to these services.  Regarding other aspects of her case plan, Mother completed her parenting program, participated in her psychological assessment, and based on Mother's statements in the record, she was not prescribed any psychotropic medications.  Over this period, Mother visited Elena three times.

On December 7, 2025, in DCFS's last minute report, Elena's caregiver who was also a paternal aunt to the siblings reported she learned from the sibling's paternal grandparents that Mother was intoxicated when she arrived at the sibling's paternal grandparents' home.  Mother struck a relative, got undressed, and was taken to a hospital.  According to the paternal grandfather of the siblings, Mother was intoxicated when she arrived at his home.  Mother stayed for a few minutes when he and the father of siblings drove Mother to the home of the great-grandparents of the siblings.  Mother was unconscious during the drive and did not hit anyone.  According to the paternal grandmother of the siblings, Mother was intoxicated when she arrived at the paternal grandmother's house.  The siblings' father and grandfather then took Mother to the siblings' great-grandparent's house.  Although the paternal grandmother

was not present, she said Mother was so intoxicated that she did not know who she was when she arrived at the siblings' paternal great-grandparent's house. She then took off her clothes, and the paramedics took her to a psychiatric hospital. According to the paternal great-grandmother of the siblings, Mother arrived at her home incoherent before she was taken to a hospital. According to Mother, there was no altercation, but she did not respond to questions about whether she went to the house of the siblings' father. According to the father of the siblings, he said he had no knowledge of Mother coming to the house. The same paternal aunt of the siblings who made the initial report also said that the father of the siblings called her and was upset she told minor's attorney about the incident and asked her to change the story.

In the service log reflecting DCFS's contact with Mother, in July 2025, the social worker told Mother that she should participate in the siblings' case plan, which "included a 730 Psychiatrist Evaluation."

The trial court found that Mother was not in substantial compliance with her case plan, terminated Mother's family reunification services regarding Elena, and set a hearing under section 366.26 for permanency planning. The court found that DCFS provided reasonable services to Mother. The trial court noted that Mother was receiving services for over 18 months because she was also in services for the siblings' case, and further reasoned that she found reasonable services in the siblings' case. The trial court also noted that the psychologist "recommended" a psychiatric evaluation, "which the court also ordered."

Mother filed a notice of intent to file a writ petition on January 29, 2026.

## DISCUSSION

Mother primarily argues that DCFS should have facilitated a psychiatric evaluation, but the trial court excluded a psychiatric evaluation from Mother's case plan after Mother objected to it. Mother also points to Mother's psychological evaluation where the psychologist stated that a psychiatric evaluation "should be considered," but that statement falls short of a full-throated recommendation and was made in the context of the psychologist's conclusion that Mother did not present with acute mental health problems. Finally, DCFS attempted to speak to Mother to assist her in accessing appropriate services, but Mother refused to speak to the social workers. Based on this record, we find substantial evidence supports the trial court's finding that DCFS provided reasonable services as social worker.

### 1. Writ and reasonable services principles

Under section 366.26, subdivision (*l*), an extraordinary writ is a proper vehicle to challenge an order setting a hearing under section 366.26, where a parent's parental rights could be terminated. Consistent with the statutory scheme, we determine this writ petition on the merits. (*Id*., subd. (*l*)(4)(A).)

At the six-month review hearing, the juvenile court determines "by clear and convincing evidence whether reasonable services that were designed to aid the parent … in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent." (§ 366.21, subds. (e)(8), (f)(1)(A).) "To support a finding that reasonable services were offered or provided … 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during

9

the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult.' " (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) The agency "must make a ' " 'good faith effort' " ' … to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success." (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.) However, the standard is not whether the services " 'were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re J.E.* (2016) 3 Cal.App.5th 557, 566.) We review the juvenile court's reasonable services finding for substantial evidence. (*In re J.P.* (2017) 14 Cal.App.5th 616, 624.)

**2.    The trial court's reasonable services finding is supported by substantial evidence**

Mother primarily argues that DCFS did not provide reasonable services to Mother because DCFS did not assist in securing a psychiatric assessment for Mother. However, we initially note that Mother's case plan did not include a psychiatric assessment because Mother successfully objected to the psychiatric assessment at the dispositional hearing. As a result, the trial court ordered a psychiatric assessment in the siblings' case, but not in Elena's. We must measure DCFS's efforts against the circumstances of each case, and here the trial court initially concluded a psychiatric assessment was unnecessary. (*Armando L. v. Superior Court* (1995) 36 Cal.App.4th 549, 554.) Thus, DCFS can hardly be faulted with failing to assist in securing a psychiatric assessment for Mother when Mother's successful objection resulted in the trial court excluding it from her case plan.

Mother also argues the psychologist evaluating Mother "recommended" a psychiatric evaluation. However, the record does not support this claim. Rather, the psychologist stated that a psychiatric evaluation should be "considered." Here, the psychologist's permissive language falls short of a recommendation. In contrast, the psychologist made a series of recommendations for Mother's reunification plan, particularly her therapy. Psychologist Gonzalez stated Mother "would benefit" from individual therapy, a trauma informed approach "is recommended," and therapy "should also include" family therapy. Regarding other services, Gonzalez stated a drug treatment program "is advised."

Mother relies on *In re K.C.* (2012) 212 Cal.App.4th 323, but that case is distinguishable for some of the reasons we have already discussed. There, with some caveats, a psychologist made a preliminary diagnosis of the father with "mood disorder with obsessive-compulsive features" and "[p]aranoid [p]ersonality [d]isorder," among other diagnoses. (*Id.* at p. 326.) The psychologist went on to say that "[s]ervices that 'should be offered to treat the diagnosis' included '[m]edication and therapeutic management through psychotropic evaluation and treatment for possible mood and thought disorder.'" (*Ibid*.) While the social worker coached and assisted the father in visiting a public mental health service provider three times, including by recruiting father's therapist to accompany the father on a visit, the provider continually turned the father away for services. (*Id.* at p. 327.) There, the social worker did not assist the father in accessing other potential mental health service providers, and the Sixth District found no substantial evidence supported the trial court's reasonable services finding. (*Id.* at p. 329.) *K.C.*

11

presents different facts from those here. Most importantly, the psychologist in *K.C.* recommended a psychotropic evaluation, while the psychologist here did not.

Mother also cites to *Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, but that case is also distinguishable. There, the mother "experienced a relapse of schizophrenic episodes that involved violent hallucinations of harming and killing their child." (*Id*. at p. 401.) In that case, there was "no evidence the agency offered services to either parent designed to help them improve mother's ability to take her medication as prescribed." (*Ibid*.) Our case is not analogous, as the psychologist here concluded Mother "does not currently present with acute mental health problems." Moreover, DCFS did secure a psychological evaluation of Mother, and did connect her with services to address her substance abuse.

In reply, Mother also argues that DCFS mistakenly believed that Mother's case plan in Elena's case included a psychiatric evaluation. This argument finds no support in the record. Rather, DCFS merely told Mother that she was ordered to complete a psychiatric evaluation in the siblings' case, which appears to be an accurate statement. In addition, Mother selectively cites the jurisdictional report and a heading in the report to argue that DCFS understood that the trial court ordered a psychiatric evaluation in this case. However, when read in context, DCFS correctly noted that the psychologist said that a psychiatric evaluation should be "considered" and does not say that the trial court ordered one in this case. Mother also notes that the trial court stated that it "ordered" a psychiatric evaluation for Mother, but this is a factually correct statement as the trial court did make that order, albeit in the siblings' case.

12

Moreover, to the extent there is some imprecision in the record between psychiatric and psychological evaluations, the only evaluation ordered in this case was a psychological one, and that evaluation took place.

Finally, DCFS largely connected Mother to services, but Mother did not complete them. As an initial matter, the psychological evaluation took place despite Mother cancelling various appointments. In addition, Mother made it difficult for DCFS to communicate with her by refusing to speak via phone and frequently neglecting to respond to text messages. Further, when Mother articulated that she was uncomfortable with a social worker, DCFS selected a different social worker to connect Mother to services. However, after the change in social workers, Mother still did not communicate with DCFS. On this record, the trial court's finding that DCFS provided reasonable services is supported by substantial evidence.

## DISPOSITION

The petition is denied.


VIRAMONTES, J.


WE CONCUR:



STRATTON, P. J.



WILEY, J.


13